### FIELD v. BARBER ASPHALT PAV. CO.

(Circuit Court, W. D. Missouri. July 15, 1902.)

#### No. 2,407.

1. CLOUD ON TITLE—REMOVAL—ACTION IN EQUITY—POSSESSION OF PLAINTIFF.
   A suit in equity may be maintained for the removal of a cloud on title under the Missouri statutes, though plaintiff is not in possession.

2. UNITED STATES COURTS—JURISDICTION—AMOUNT IN CONTROVERSY.
   Where complainant sued to set aside special tax bills assessed against certain lots in a city, of which he owned the fee, and he was the equitable owner of other lots assessed, and the tax bills on all the lots amounted to over $2,000, the federal court had jurisdiction.

3. MUNICIPAL CORPORATIONS—SPECIAL TAXES—TAX BILLS—REGISTRATION BY CITY CLERK.
   The failure of the city clerk of a city to register tax bills for special assessments, as required by the Missouri statutes, is not a sufficient defense against the bills, the statute being directory merely.

---

¶ 2. Jurisdiction of circuit courts as determined by amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Shoe Co. v. Roper, 36 C. C. A. 459.

**4. SAME—STREET GRADING—ASSESSMENT.**

Where the evidence, in an action to restrain a special city assessment, showed that the grading, for which the city was not entitled to charge the abutting property, was not included, at least to any great extent, in the cost of paving, and no extra charge or expense for the grading was made, the fact that some grading was done was immaterial.

**5. SAME—CITY IMPROVEMENTS—PROTEST—STATUTES—CONSTITUTIONALITY—REVIEW.**

Where a nonresident property owner did not appear after notice and attempt to protest against a city street improvement, he cannot, in an action to restrain enforcement of tax bills against his property, obtain a review of the constitutionality of Laws Mo. 1895, § 95, limiting the right to protest to resident owners.

**6. CONTRACT FOR IMPROVEMENT—ACTS OF ALDERMEN—REVIEW.**

The board of aldermen of a city, in procuring the improvement of streets and letting the contract therefor, do not act in a legislative capacity, but act in an administrative or business capacity, and hence their acts are reviewable on the ground of fraud or corruption.

**7. VALIDITY OF CONTRACT—LIMITATION AS TO MATERIAL.**

Where a contract for the paving of a street with asphalt limited the kind of asphalt to be used to Trinidad asphalt, such fact, and the further fact that such asphalt was controlled by a single corporation, did not affect the validity of the contract.

**8. SAME—EVIDENCE.**

Evidence in an action to vacate special tax bills for municipal improvements reviewed, and *held* not sufficient to show corruption on the part of the city council.

**9. SAME—NECESSITY OF IMPROVEMENT—REVIEW.**

Where one of the streets of a city, located in an extreme and thinly populated portion, had been well paved with macadam in 1892, and at the time the street was ordered paved with asphalt by the city council, in 1897, the macadam was not badly worn, and the street was in good condition, the subsequent improvement was unnecessary, and special assessments therefor void.

In Equity.

R. H. Field, for complainant.

Scarritt & Scarritt, for defendant.

McPHERSON, District Judge. Not being able to announce my views in the presence of counsel, I reduce my conclusions to writing, that they may be advised, and a decree accordingly prepared.

This case is one in equity to cancel certain alleged tax bills, which defendant asserts are liens on plaintiff's real estate. Under the Missouri statutes, plaintiff, in or out of possession, by proceedings in equity can remove any wrongful cloud upon his title, and this court may follow such procedure. Complainant is the owner of certain lots facing on three streets in the city of Westport, state of Missouri, which, December 2, 1897, on due proceedings, was merged in and became part of Kansas City. Excepting as to one matter to be presently noticed, this date is not material, because all things done which are now the subject of controversy were done prior to that date, and when Westport was an independent and separate municipality. The jurisdiction of this court is challenged on the ground that an amount less than $2,000 is in controversy. This contention arises on the following facts: The complainant, R. H. Field, owns certain lots, and has the legal title thereto, in front of which paving

was done. The tax bills for paving in front of those lots amount to less than $2,000. But complainant has an equitable ownership, at least, in certain other lots. The title was taken in another as a mere convenience, and a declaration of trust executed in favor of plaintiff as to those lots. Why complainant is not liable for those taxes I do not understand, and why he is not interested in clearing those lots of an alleged illegal tax has not been made to appear to me. Adding those tax bills to the others, all held by defendant, and the jurisdictional sum is in controversy. The paving was done on three streets in Westport, under certain resolutions and ordinances of Westport and contracts between that city and the defendant company. The paving and work was done, and the tax bills made out and signed by the proper officer, prior to December 2, 1897, on which day, by a general election, the town became part of Kansas City. But the complainant insists that, because the tax bills had not then been registered in the books of the city, and, of course, not delivered, such registry and delivery could not subsequently be made. I am content to state that in my judgment the statute is directory, and in no event could the failure of the city clerk to register the tax bills defeat the defendant, and deprive it of compensation for labor and material, if otherwise it would be entitled to such compensation. Such technicalities ought not to defeat substantial rights.

And it is urged that the three streets, or some of them, had not been brought to the established grade, and that for grading the streets tax bills could not be issued as against the adjacent lots. And such seems to be the law. But the evidence shows that the matter of grading was but little more, if any, than what was required as part of the paving; that is, evening the surface, and putting it in proper condition. And, at all events, there was no extra expense or charge for the so-called grading. I therefore conclude that this contention is without merit.

Section 95 of the Laws of 1895 (statutes of Missouri), under which the proceedings in question were had, in substance provides that the resolution for paving can be defeated or nullified by a protest filed by a majority of the resident owners liable to be taxed on account of such improvement; and by implication, at least, the nonresident owner cannot protest. Complainant was a resident of Kansas City, and therefore a nonresident of Westport; and he urges that this was an unjust and arbitrary discrimination in favor of a resident and against him and other nonresident owners, for the reason that resident owners, by protest, could defeat the resolution, whereas the law would not allow the city officials to receive or recognize the protest from him and other nonresident owners. It is a well-recognized rule, and familiar to all, that parts of a statute may be void, as being in conflict with the constitution, and the balance of the statute will stand and be enforced; and it is likewise recognized that courts will not decide questions that are not practical, or necessary for the determination of the case, or some phase of the case. If rights of parties have been trampled upon by reason of this statute, and a property right accorded to a resident of Westport which is denied to a resident of Kansas City, it would be

readily seen that there would be great force in the argument of complainant's counsel that the provision in question is in conflict with the federal constitution. But I fail to find any fact of record in this case that calls for a determination of the question so elaborately argued. It seems to me that the conclusive answer is that complainant had some knowledge of what was going on and what was being done, and he made no remonstrance, and did not file or offer to file a protest, although it may be that he had no actual knowledge until too late to protest. But he had notice the same as residents, to wit, by publication. If the resolution or proceeding could be defeated by protest, and if the complainant had the same right to protest, not by the statute, but under the constitution, as a resident owner had, then why did he not protest, or offer to protest? And must he not do that or offer to do that which was required of a resident, before he can claim that he is denied equal protection? It seems clearly so to me, and a discussion of or deciding the question is wholly academic.

The evidence in this case is voluminous, and I have read and studied it with care, because of the charge of fraud in the procurement of the contract. When the board of aldermen were acting in this matter, I believe, and so hold, that it was not acting in a legislative capacity, but was acting in an administrative or business capacity. And, this being so, the charge of corrupting influence demands consideration. The charge, generally speaking, is that one McGowan, a long-time and active politician of Kansas City and of the county, was the active agent of defendant, receiving his compensation quite likely in the shape of commissions; and, the more contracts, the larger his receipts for his work. His method was to procure the signature of resident owners, asking for the paving of the streets, which he did for a double purpose. The one was to give a moral backing to the aldermen, who would then say they were merely carrying out the will of the people. The other purpose was to forestall the protests which might otherwise be made, and thereby defeat the scheme. That such were his purposes I have no doubt. And that he was very active I have no doubt. It is alleged in the bill that, in order to obtain these signatures, McGowan offered rebates on the special tax bills of such signers thus obtained. If this be so, it would be bribery and corruption, as fully as if money were paid directly to prevent protests, and, in my judgment, ought to and would defeat the special tax bills. Corruption, such as bribery, will not defeat legislative action, yet the action of aldermen and of others necessarily connected therewith in a business or administrative transaction would be defeated by a showing of knavery like that charged. And, if the proofs were present, I would not for a moment hesitate to so decide. It is within the knowledge of all that there is no other burden so great as that of municipal government, and no other matter calling for closer scrutiny than the administrative affairs of municipal government.

The conclusions I have reached are not entirely satisfactory to myself, but they are more nearly so than if I were to find otherwise. The agent, McGowan, as already stated, was active in working up these contracts; and, while the proofs do not show it, was, I assume,

working on a commission. He no doubt importuned the resident property owners to sign his petitions. The board of aldermen, as it seems to me, was swift to pass the resolutions and make the contracts for paving those three streets connecting the two cities, which streets were but a block from a street to another, and all parallel streets, with but very few buildings thereon. That the action of the aldermen was very oppressive to the property owners, and particularly to those nonresident, need only be stated, as there is practically no evidence to the contrary. But the fact that the aldermen acted oppressively does not show bribery, or other corruption; and I have searched the record, and find no evidence of corruption. The whole story is that McGowan worked for and obtained the contracts, pressing the people with the supposed advantages that paving would be, and then pressing upon the aldermen that the will of the people must be carried out. But I fail to find evidence that there was any sharing of the profits with any of the aldermen, or the receiving by or offering of rebates to any of the property owners. There is evidence that the attorney for the defendant company prepared the resolutions and ordinances. I see nothing wrong in this, for my experience and observation have been that contractors with municipalities either insist upon having their own attorneys do such work, or at least work in conjunction with the solicitor for the city, to the end that there will be a contract upon which a recovery can be had, or the bonds floated, when the contractor has done his work. That there were some irregularities in the adoption of the resolutions and ordinances and in making the contract is apparent; but, without discussing them, it is enough to say that these defects were not substantial. Complainant resided near by, had some knowledge of what was going on by publication, if not actual notice, and made no protest, and ought not now be allowed to have the paving, and escape payment by proceeding in equity, on the grounds above referred to.

The evidence shows that the contracts called for "Lake Trinidad asphalt." There is evidence tending to show that good asphalt, and quite as good as Trinidad, can be obtained from Bermuda, Mexico, and from places in the United States. On such facts it is contended that the city had no right to limit the contract to Trinidad, and that in so doing the commerce clause of the constitution was violated, and that the federal anti-trust statutes were likewise violated. And this argument is emphasized by complainant's counsel, because, as he contends, the defendant has a monopoly of Trinidad asphalt. The evidence does not show this to be so. But, if it does have the monopoly, I do not believe the point is well taken. An individual certainly has the right, in the erection of an improvement, to get that which he believes the best, and that which he prefers, regardless of the reason; and he should not defeat a recovery by showing that in fact something else was as good or better, or that the vendor had a monopoly. And why should not the same holding be made as to a city? Can it be so that because the city concludes, although wrongly, that Trinidad is the best asphalt, that its contract must be canceled on a showing that the Trinidad is not the best, and that it is

117 F.—59

the subject of a monopoly? Why limit the evidence to other asphalts? Why not receive evidence as to brick or other paving? I think this matter was in the province of the city to determine, and that the courts have no right to review it.

Other objections are made, such as alleged violations of the state constitution, and a failure to observe the state statutes, which I feel that I need not present in detail, believing that they are without merit. But there is an objection to part of the paving which is not one of irregularity, but an objection calling for special consideration, and a ruling thereon. The claim is made as to part of the paving that it was unnecessary and unreasonable, because the streets had recently been paved with other material, as yet but little worn, and which was substantial, and sufficient for all practical purposes, and that this former paving had been done at the expense of the adjacent property owners. That a city council can pave its streets on due proceedings is conceded by all. But when this power has been exercised, and the streets paved, and the expense thereof taxed up against the adjacent property owners, and they have paved the same, when may the city council again have the street paved? I concede that, if it is doubtful whether the former paving is still suitable, the judgment of the city authorities to repave should not be ridden down by the courts. But can the city council one year macadam the streets, and the next year, with new officers, pave with brick, and the next year with asphalt, all at the expense of the adjacent property owners, merely to suit the whims of supposed taste of the yearly change of city officers? Must not such oppression, which amounts to confiscation, be controlled by the courts? Can such matters be under the exclusive control and jurisdiction of the officers of the city? I am clearly of the opinion that the courts should and must interfere if the streets are already covered by a substantial paving. The evidence shows the following: Wyandotte street, one of the streets in question, was paved with macadam in the year 1892 or 1893, four or five years before the asphalting in question. To all practical purposes the part of the street in question was in the country, with but few houses, and quite a distance from any place that could be called a city, or part of a city, other than by name. There were no sidewalks. The macadam was about 12 inches thick, and when swept off was all right, and in good condition. It was but very little worn, and good for many years' service. It had been put down by municipal authority, and assessed up and against the adjacent property, and special tax bills had been issued therefor, and paid for by the owners of the adjacent property. It therefore seems to me, and I so hold, that the repaving could not be lawfully done solely because the municipal authorities within the four years had changed their minds as to the materials for paving, and that, as a matter of taste, asphalt to them seemed the better, or smoother, or the more beautiful. These suggestions do not apply at all to Baltimore street, and only in a measure to Main street.

The decree in this case will afford the complainant the relief prayed for as to Wyandotte street, and the relief prayed for will be denied as to the other two streets; each party paying half the costs.