**ECKERLE et al. v. FERRIS et al.**

No. 26692. Oct. 29, 1935.

Rehearing Denied Dec. 3, 1935.

McPherren & Maurer and Tench Tilghman, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., Houston E. Hill, L. V. Orton, Right of Way Attorney, and G. A. Paul, for defendants in error.

WELCH, J. For the purpose of this appeal the facts in material substance are as follows: Plaintiffs are taxpayers of Oklahoma county, and the defendants are members of, and constitute the State Highway Commission.

The defendants advertised for bids on 19 miles of highway construction, being five federal aid roadway construction projects, and one federal aid roadway and bridge

construction project situate in three counties of the state.

The plans and specifications provided for the construction of grade and drainage and the construction of permanent rock or gravel base for the highway; for the construction of the necessary bridges and culverts and for a wearing surface or finishing coat of rock asphalt.

As to the finishing coat of rock asphalt, the specifications provided for the use of "blended rock asphalt," requiring the use of natural sand rock asphalt and natural lime rock asphalt, and specifying by percentages the exact proportions of each to be used to constitute the required blended rock asphalt, and providing the manner of mixing of the natural product, and also providing in detail for the required bitumen content of the lime rock and of the sand rock, and requiring in each instance the use of natural products meeting these specifications, and forbidding the adding of fluxing material or hard asphalt in order to bring the bitumen content within the specified limits. The specifications further required as to the blended rock asphalt that it should be obtained from a source of supply to be approved by the engineer, and from a source of supply or deposits which for a period of at least two years had produced raw rock asphalt which had been laid in pavement, and which had given satisfactory services when blended in a general manner as provided by the specifications; that the blended rock asphalt should be prepared at a plant capable of maintaining the required uniformity of quality at the necessary rate of production; reserving the right to reject further use of any blended rock asphalt which failed to produce satisfactory results in the work, even when taken from a formerly approved source of supply, until and unless the producer should satisfy the engineer that such material would produce satisfactory results in the work. The specifications further reserved the right to reject material becoming contaminated with dirt or foreign materials, and with provisions for sampling and testing and the like.

The plaintiffs, as taxpayers, sought to enjoin the defendants from entering into contracts on these construction projects. The plaintiffs in no manner attack the action of the Highway Commission on the proposed contracts, except in so far only as refers to the traffic surface or finishing coat of rock asphalt. As to that item the plaintiffs contend that the specifications, providing in detail for the use of blended rock asphalt, are so worded as to result in requiring the use of products obtainable only at one location in the state, where two mines or pits operating together can supply the required product. The plaintiffs say that these specifications thereby wrongfully require the use of products from one specified source of supply, operating to create a monopoly and preventing competitive bidding on the material specified for the top surface of the roadway; that therefore the action of the defendants is unlawful and involves unlawful expenditures of public funds and should be enjoined, and under temporary order the defendants are forbidden to enter into any contract for the construction of any part of the roadways and bridges of the aforesaid six construction projects.

The petition, however, does show that all bidders on the construction work may purchase the material specified for the finishing coat of the roadway at the same price.

The plaintiffs do not contend that any other produces the same material, but do contend that there are producers of road building material who can, by manufacturing processes, mix sand rock, lime rock and asphalt so as to produce by manufacturing or mixing process a finishing product as good or better than the natural product required by the specifications.

To a petition presenting the above facts and contentions, in substance, the trial court sustained a demurrer upon the ground that the petition did not state facts constituting a cause of action, and the cause is regularly here on appeal from that order and judgment of the trial court. The question for our consideration is whether, upon these allegations, taken as true for the purpose of the demurrer, a cause of action is stated to enjoin the defendants. The question of the capacity of plaintiffs, as general taxpayers, to maintain this suit is not specifically attacked.

The original restraining order was issued in the trial court before the date for receiving bids, and the Highway Commission was restrained from opening bids. That order was modified by agreement to permit the Highway Commission to receive the bids and open the same, though continuing the restraint from entering into any contract. The plaintiffs had permission thereafter to amend their petition, but presented no additional facts indicating any other or further difficulties in the presenting of bids on the general construction work.

and in fact elected to file no amendment to their petition. So that other than as above stated, it is not contended that there were any facts that would or did operate to chill or stifle competitive bidding on the construction work of the various projects.

It is to be noted that the petition does not in any manner purport to charge the defendants with any kind of fraud or collusion. It is merely asserted that to solicit bids and to contract upon the specification so drawn is illegal, as not properly allowing competitive bidding. The plaintiffs in their petition do refer to this as constituting or resulting in a legal fraud, but there is no attack on the motives or good faith of the commissioners.

Our statutes, as shown in chapter 50, O. S. 1931, with amendments as shown in chapter 22, S. L. 1933, and chapter 167, S. L. 1935, and chapter 50, S. L. 1935, place upon the Highway Commission the duty of constructing, controlling, and maintaining our state highways, with broad authority and power in designating the method and manner of construction, type of materials to be used, etc. That commission is authorized to construct roads, upon contracts let on competitive bidding in conjunction with the federal government, as is contemplated in these projects. That commission is also authorized to build roads upon a forced account basis, or by paid labor instead of advertising for bids and contracting for the completed construction. We have in the past constructed roads of various kinds of material, and we have constructed and prepared roads and maintained them by day labor, and by convict labor. The Highway Commission is specifically authorized to purchase machinery, supplies, and road building material, necessary to carry out the purpose of the law to construct highways. There is also authority in proper cases to take, by condemnation proceedings, deposits of road building material. In any such case in which the Highway Commission deemed it necessary to acquire any particular or designated materials or supplies, we know of no rule of law that would prevent the commission from acquiring that material merely because it could be obtained only from one source of supply. No such restriction is in any manner indicated in the statutory provisions upon the subject. For that matter it does not expressly appear that the plaintiffs here contend for such rule of law.

It is the contention of the plaintiffs that, since the specifications provide for a particular blended rock asphalt which can only be furnished by one producer in strict compliance with the specifications, the statutory provision directing the contract for construction to be let on competitive bidding is necessarily violated. While the defendant contends to the contrary.

Upon analysis, the contention of plaintiffs must be based upon one or the other of two theories: That is, one, that the commission cannot, in any event, specify a material or product which is exclusively owned or controlled, or for which there is only one known source of supply; or, two, that in this case the specification of this rock asphalt having but one known source of supply at this time, the specification thereof operates to violate the direction of the statute as to letting the construction contract on competitive bidding.

From the plaintiffs' petition and their briefs and argument, they present the cause upon the latter or second theory above stated.

That exact question seems to have first been noticed in the courts about the year 1867, when it was determined one way in Wisconsin, and the other way in Michigan.

In Dean v. Charlton, 23 Wis. 590, 99 Am. Dec. 205, a special assessment case, it was held, in substance, that the specifying of a material or product to be used in the construction work of laying pavement, which was exclusively owned or controlled by one man, violated the provision of law for competitive bidding.

In Hobart v. City of Detroit, 17 Mich. 247, 97 Am. Dec. 185, it was held to the direct contrary, upon the general theory that the city officials have the right to select the desired material or product to be used, even though exclusively owned or controlled, provided only the contract to perform the contract of laying the pavement is let by competitive bidding, all bidders having the same right to obtain the specified material or product, upon the same terms.

It is to be noted that both these cases involve a patented article or product, and both involve construction work to be paid for by special assessment on individual property owners.

Following its decision in Dean v. Charlton, supra, the same court decided Kilvington v. City of Superior, 83 Wis. 222, 18 L.

R. A. 45. It was there held that the specifying of exclusively controlled material to be used in the construction did not violate the provision of law for competitive bidding. That cause also involved a patented material and would be in conflict with Dean v. Charlton, but for the distinction therein noted. That distinction was that the former opinion dealt with special assessment improvements, while the Kilvington Case dealt with construction work contracted for by the city under its broader general municipal powers, to be paid for from funds of the city, and not through special assessments. The court in its discussion said:

"* * * But in Dean v. Charlton the majority of the court, after commenting upon the case of Harlem Gaslight Co. v. New York, 33 N. Y. 309, expressly disclaimed deciding whether the city might not have contracted for laying such pavement at its own expense, under its general municipal powers, which is really the question here presented. * * *"

In Allen v. Milwaukee, 106 N. W. 1099, 5 L. R. A. (N. S.) 680, the Supreme Court of Wisconsin followed Dean v. Charlton, supra, in a special assessment case, but again noted the distinction between Dean v. Charlton and the Kilvington Case, supra.

This treatment of the question in Wisconsin is interesting, in view of the fact that the case at bar does not involve a case where a city is contracting as the restricted agent of certain property owners against whom special assessments are to be made, but, on the contrary, involves the action of the State Highway Commission with broad statutory powers.

In Fishburn v. City of Chicago, 49 N. E. 532, a special assessment case, the Supreme Court of Illinois followed the rule of Dean v. Charlton, though in that case the situation was burdened with the additional circumstances that the company exclusively owning the specified paving material was also in the business of laying pavement under contract.

A similar situation is shown in Fineran v. Central Bitulithic Paving Co. (Ky.) 76 S. W. 415, where the Supreme Court of Kentucky, in a special assessment case, followed the same rule. The fact was there emphasized that the company exclusively owning the specified material was also in the construction business and bid on the construction involved and was the only bidder thereon; that under the circumstances shown there could be no other bidder, and, therefore, was no competitive bidding. It is thus indicated in that case that the specified paving material was not available to other bidders. The opposite is true in Hobart v. Detroit, supra, and in other cases hereinafter referred to, and is also true in the case at bar, where the blended rock asphalt is obtainable by all bidders or by any contractor at a fixed price.

Later the Supreme Court of Kentucky, even in a special assessment case, in City of Springfield v. Hayden, 288 S. W. 337, held that the specifying of rock asphalt from a particular named locality did not violate the provision of law requiring competitive bidding, since the company owning and controlling that product was not in the construction business, but was only in the business of mining and selling the rock, and since it appears that any contractor could buy the material specified.

The specification which was there upheld by the court, as set out in the ordinance, called for the use of "Kentucky rock asphalt," and provided that:

"The Kentucky rock asphalt shall be the standard Kentucky rock brand of natural bituminous sandstone which has been mined or quarried from proven deposits of bituminous sandstone in Edmonson county, in the state of Kentucky, and shall be from a site or a place in a geological formation that has produced standard Kentucky rock asphalt which has been used as a successful paving material for a period of five (5) years immediately preceding this date."

There was further provision in the ordinance that each proposal should be accompanied by a service affidavit showing that the material proposed to be used is at this date in good service condition after five years of use under the present day traffic in three or more roadways, without maintenance or repair due to defects. And that "no bitumen, sand, or other material shall be added to or mechanically mixed with the natural rock asphalt."

In the case at bar there was similar specification for the use of the natural rock asphalt, and forbidding the adding thereto of any other material by mechanical mixture, and for the use of material from a source of supply proven by two years' use.

In the Springfield-Hayden Case the ordinance as to specifications, in other places, spoke of the natural rock asphalt to be used, and called it "Kyrock," which was the trade name of the natural rock asphalt produced from the mines of the Kentucky Rock Asphalt Company in Edmonson coun-

ty. It was there contended that the ordinance and specifications limiting the construction of the surface to the use of natural rock asphalt mined by the Kentucky Rock Asphalt Company rendered the ordinance void. However, the court upheld the specification, giving prominence to the fact that the natural product was obtainable by any contractor, and that the producing company was not in the construction business, and the court upheld as reasonable the provision there requiring proof of five years' satisfactory use of the product on similar roadways. The court there referred to the former decision of the same court in Fineran v. Central Bitulithic Paving Co., supra, and pointed out that the underlying reason for the decision in the Fineran Case was that the specifications were so arranged that in that case there could be but one bidder on the contract, and that in fact there was but one bidder, that being the company which exclusively owned the specified material, which no one else could obtain in order to carry out the construction contract. In that case also, as in the case at bar, there was a difference between the cost of the material specified and other material which it was asserted was equally as good for the construction purposes. The similarity of the case and the reasoning there used constitutes this case a strong authority for the upholding of the action of the trial court in the case at bar.

An interesting contrast is presented in Barber Asphalt Co. v. Hunt, 13 S. W. 98, where the Supreme Court of Missouri first considered this question. That court in a special assessment case upheld the contract upon specification of material exclusively controlled, though the owner of the material was himself the contractor, and stated in the opinion:

"In New York it has been ruled, under a statute requiring all city work to be let 'to the lowest bidder,' that the common council were not prohibited from letting a contract for paving a street with material or in a manner not admitting competitive bids or proposals. In re Dugro, 50 N. Y. 513. This ruling was approvingly followed in Baird v. Mayor, 96 N. Y. 567. Prior to the time the subject was discussed in New York, a similar ruling had been made in Michigan. Hobart v. Detroit, 17 Mich. 246. These cases seem to us to rest upon the correct basis. It certainly was never intended that the city authorities should be unable to make a contract, however necessary to the public welfare such contract might be, if the article desired, or the manner of the performance of the contract required the use of a patented article. Such a construction of the charter we regard as 'sticking in the bark,' and as subordinating the whole powers conferred on the common council to the meaning of two or three words contained in a single section of the charter. Besides, the rights of those interested are protected by the necessity of obtaining the approval of the council to any contract. A different view of the matter under discussion has been taken in Wisconsin (Dean v. Charlton, 23 Wis. 590), but by a divided court; and it is noteworthy that the Legislature of that state did not approve the view of the statute taken by the court, and so changed the statute, so as to prevent the continued prevalence of the objectionable ruling. (Mills v. Charlton, 29 Wis. 400; Dean v. Borchsenius, 30 Wis. 239.)"

In Siegel v. Chicago, 79 N. E. 280, the Supreme Court of Illinois considered a special assessment case involving patented material, and which cited and followed Dean v. Charlton, Fishburn v. Chicago, and Fineran v. Central Bitulithic Paving Co., supra. This case follows the rule contended for by plaintiffs, in a special assessment case, but refers to the opposing authorities headed by the parent case of Hobart v. Detroit, 17 Mich. 245. In this case, on page 283 of the Northeastern Reporter, it is pointed out that the authorities following the rule contended for by plaintiffs did so upon a strict construction of the statutes as to competitive bidding, while the authorities holding otherwise, that is, to the view contended for by defendants, Highway Commission, arrive at their conclusion by a liberal construction of the statute. In the body of the opinion it was said:

"It has been heretofore decided by this court that our statute on local improvements, delegating, as it does, to municipalities the power to levy special assessments to pay for public improvements, is to be strictly construed, and that where the statute provides a particular mode for the exercise of such power that mode must be pursued, and no other can be substituted for it by the officers who undertake to exercise it."

The court then concluded that the specification of material exclusively owned was unlawful, in case of the exclusive ownership of the material, "but for the reason that if it is so prescribed, competition, so far as furnishing that material is concerned, must be, and is, entirely absent." Thus that court adhered firmly to the strict construction rule as applied to special assess-

ment cases, which has heretofore been announced by that court.

It would seem from that authority that the foundation of the strict construction rule is wholly absent from the case at bar. It would also seem from the reasoning of the Illinois court in that case that even in those states following the strict construction rule in special assessment cases, the liberal construction rule would apply in cases such as the case at bar where no special assessment is involved. That thought is confirmed by the fact that the state of Wisconsin, the parent state of the strict construction rule in special assessment cases, specifically declined to apply that rule in a later case which did not involve a special assessment, that is, Kilvington v. City of Superior, 18 L. R. A. 45.

Some years later, in Village of Rossville v. Smith, 100 N. E. 292, the Supreme Court of Illinois again considered this question in a special assessment case. There the specifications were set out in minute detail, which do not in the face of the specification show exclusive ownership of the required material, but in fact the specifications as prepared did so result (similar in that respect to our highway case). The court there cited and followed the Fishburn v. Chicago and Siegel v. Chicago Cases, and again emphasized the fact that the rule would be followed in special assessment cases, applying to such case the strict construction rule as in the Siegel Case. The court there indicated by clear statement that exclusive ownership under patent was no different from other exclusive ownership. To the same general effect is the later decision of the same court in Schoellkopf v. Chicago (Ill.) 128 N. E. 337, another special assessment case where the same strict construction rule is followed.

In Smith v. Syracuse Improvement Co. (N. Y.) 55 N. E. 1077, in a special assessment case, it was held improper to specify that the street should be paved "with vitrified paving brick manufactured by the New York Brick & Paving Co.," since other companies manufactured the same vitrified paving brick as good as that of the specified company, and therefore this specification did stifle and wrongfully interfere with competitive bidding.

That seems clearly distinguished from our highway case on the facts, and it seems certain that at least in a special assessment case the authorities could not specify a paving product on the general market, manufactured by several competing persons, and specify that the product of only one, calling him by name, should be used in the construction work.

In Redersheimer v. Flower, Mayor (La.) 28 So. 299, we have another special assessment case. This is relied upon or strongly asserted as sustaining the plaintiffs' view. We are unable to find it much in point. It is true the letting of the contract was vacated, but the fact appears to be that it was vacated because the contract was awarded to one Spinks at $2.58 per square yard, whereas one Kelly had tendered his bid of $2.40 per square yard, the law requiring that the contract be let to the lowest responsible bidder.

The city officials for some reason, not fully disclosed in the opinion, awarded the contract to the highest of these two bidders. The fact statement shows that the city authorities advertised for bids upon natural rock asphalt, and also upon artificial or manufactured sheet asphalt, the one being there considered of equal value to the other, and the opinion states there was no material difference. That being so, the case seems to turn on the fact that the contract was not given to the lowest bidder. (A point not present at all in the case at bar.)

In that case there was objection to the method of specifying the natural rock asphalt, in that it specified foreign asphalt from the Sicilian mine at Regosa, or from the Swiss mines at Val de Travers and the French mines at Seysel. It is made clear in the opinion that since the awarding of the contract must be vacated, that it is the view of the court that in a further letting the authorities should be more liberal in their specifications as to rock asphalt, so as to include domestic rock asphalt.

This case is not thoroughly written as to either facts or law. It cites no authority except Berghoffen v. City of New York, 64 N. Y. Supp. 1082, as sustaining the conclusion that two years' wearing time of asphalt is a sufficient guarantee as to quality used.

In Grace v. Forbes, Mayor, et al. (N. Y.) 118 N. Y. Supp. 1062, the court considered one of the few cases found not involving construction by special assessment. That is an action for injunction by taxpayers, and seems at first glance to be the one case cited by plaintiffs which supports their contentions in such cases as the case at bar. But we find it in point but slightly, if at all. It seems that the decision of the court is based upon the construction of a peculiar statute requiring, in substance, that

all contracts for supplies or construction be let on competitive bidding and to the lowest bidder, unless the common council concludes, with unanimous approval of the board of estimate and apportionment, that it is impracticable to procure such work or material by contract. The city desired to install a fire alarm system, and desired to have the system installed by the Gamewell Fire Alarm Telegraph Company, which company held numerous patents on the various pieces of apparatus that would go to make up such a completed system. It is made apparent from the opinion that those favoring this special fire alarm system were unable to get the unanimous vote of the common council and the unanimous approval of the board of estimate and apportionment, and therefore, they prepared specifications which apparently were taken from the letters patent of the Gamewell Company, in that they described in the most minute detail the character and size of the apparatus, even to the smallest parts of instruments, and the manner in which the system and each part thereof should operate, so that by no possibility could anyone bid upon this specification except the Gamewell Company, which manufactured and installed its own type of system. Clearly in that case there could be no competition. The law there provided the method by which the city could contract without competition, and also provided a method for contract by competitive bidding, and the court held that there being a method for contracting without competitive bids, that method must be followed, or, upon the other hand, the contract must be by competitive bids.

No such special statute governs the contracting by the Oklahoma Highway Commission, and, therefore, the case is of but little assistance here.

In Verdin v. City of St. Louis, 33 S. W. 480, the Supreme Court of Missouri considered a special assessment case, specifying Lake Trinidad asphalt; not patented, but exclusively owned by the contractor. The contract was upheld notwithstanding exclusive ownership. Aside from special assessment difference, this case is very interesting in our highway case, as the facts alleged and taken as true on demurrer in the Verdin Case were that there are other sources of supply of asphalt of just as good quality for other purposes as Trinidad Lake asphalt. The petition alleged similar facts as to extra costs and is quite similar to our case, except as to the special assess-

ment feature. Syllabus 4 reading as follows:

"An ordinance providing for paving a street with a particular kind of asphalt, in which there is a monopoly, is not void, though the city charter provides for letting contracts to the lowest responsible bidder."

In general language the court in this case treats patented material the same as exclusively owned material, and cites and follows the former decision in Barber Asphalt Co. v. Hunt, supra.

Later, the same court in Swift v. City of St. Louis, 79 S. W. 172, considered a special assessment case specifying for use in the final or finishing coat of the roadway a semi-liquid composition known as "Warren Puritan Brand." These Warren substances were not patented, but were manufactured under that trade name and were so specified. The Warren Bros. did not contract construction, but only manufactured and sold the material. The contract was upheld. The court cited Barber Asphalt Paving Co. v. Hunt (Mo.) 13 S. W. 98, being a patent case, and Verdin v. City of St. Louis (Mo.) 33 S. W. 480, where the monopoly was based, not upon a patent, but upon exclusive ownership of the specified source of supply. In that case the monopoly existed by specifying a certain manufactured product by name of the manufacturer. In that case it was insisted that it was wrong to specify the material by name of the manufacturer, but that the material ought to have been designated indirectly by its constituent parts, or by making the Warren Bros. product the standard.

In the case at bar the specifications did not specify the rock asphalt by exact location or name of the owner, but did specify it indirectly by listing the component parts. That is, the specification here was opposite to the specification in the Swift Case, and the contention is here made that the specification should have been made by specifying the source of supply or the ownership by name.

In Mueller v. Boulevard Com'rs of Hudson County et al., 94 Atl. 84, the New Jersey court considered a special assessment case and held as follows:

"Boulevard commissioners may provide for the paving of a street with a material obtainable from only one party, where it is in the market and can be obtained by the bidders."

In Monaghan v. City of Indianapolis, 76

N. E. 424, the Indiana Supreme Court considered a specification of patent material. This case emphasizes the fact that it is a special assessment case and follows the rule in Dean v. Charlton, that is, the Wisconsin rule, but points out that in a later Wisconsin case, Kilvington v. City of Superior, the Wisconsin court held otherwise and distinguished that case, which was not a special assessment case.

This opinion, at page 426 of the Northeastern Reporter, points out clearly that there can be no difference in specifying a patented pavement on the one hand, and upon the other hand specifying a pavement which is not patented, but which is in fact owned and controlled by a single individual.

And in this opinion, on page 428 of Northeastern Reporter, it is clearly pointed out that if a part of the ingredients specified to be used in constructing a road are in the control of a single individual, but have a fixed price or market value at which they may be purchased for use by the contractor, and the board knows that fact, and such ingredients could be purchased by anyone desiring to purchase them for use in carrying out the contract, that in that event a competitive bidding provision would not be violated.

In the body of the opinion in that case it was stated:

"It must be admitted that the same reasoning that excludes a patented pavement would exclude a pavement not patented, but which is owned and controlled by a single individual."

From the reasoning there it would necessarily follow that in states where the specification of patented pavement is permitted, likewise in those states there would be permitted the specification of material for paving not patented, but which is owned and controlled by a single individual.

In Mayor, etc., of City of Newark v. Bonnell, 31 Atl. 408, this question was again considered in New Jersey. The entire syllabus is as follows:

"Where the proper municipal board advertises in good faith for proposals for paving streets, and specifies the employment of the material deemed by it to be for the best interest of the municipality, the city is not debarred by any rule of law from contracting for what it wants merely because the desired material is the subject of private ownership or the product of exclusive manufacture."

It is not clear whether this is a special assessment case, but from the facts stated we assume that it is not.

The Supreme Court of Iowa in two cases, Saunders v. City of Iowa, 134 Iowa, 132, 111 N. W. 529, 9 L. R. A. (N. S.) 392, and in Hoffman v. City of Muscatine, 232 N. W. 430, 77 A. L. R. 680, held that provision for competitive bidding was not necessarily violated even in cases where the exclusive owner of the specified material was himself a bidder on the project to be constructed by the use of the material exclusively owned.

The distinction seems to be that a strict rule of construction was followed in those cases holding to the rule contended for by the plaintiffs, while a rule of liberal construction of the statute requiring competitive bidding was followed by those states holding to rule contended for by the defendant. It has been so stated in the decisions.

However, as to the authorities relied upon by the plaintiffs, it is to be noted that they are cases dealing with construction projects upon special assessments. In such case it might well be said that the right to levy the special assessment to pay for the construction would depend upon a strict following of the statute as to contracting for the construction. That seems to have been the theory of the application of the strict construction rule in those cases. The reasoning in those cases can in no sense apply to the case at bar, where no assessment is necessary to pay for the construction work, but where, on the contrary, the state has provided the Highway Commission with funds for road construction, giving them broad powers in designing the roads to be made, and in selecting the materials to be used and in prescribing the method of road construction. It seems beyond question that with such authority reposed in the Highway Commission the rule of liberal construction should be applied in the case at bar. And in view of the broad powers granted the Highway Commission it must have been that the legislative intent was and is in harmony with this thought. It must be true that the power of the officers of the city in letting construction contracts, where the cost is to be paid from special assessments, would be far more restricted than the power of the Highway Commission in the case at bar.

With these former decisions from other states as persuasive authority, our own court first considered the question in Reed v. Rockliff-Gibson Construction Co., 25

Okla. 633, 107 P. 168. That was a special assessment case; nevertheless this court followed the view of liberal construction as pioneered by Hobart v. Detroit, 17 Mich. 246, 97 Am. Dec. 185, and followed by numerous other states, and held that the specifying of exclusively controlled paving material, designated by name, did not violate the provision of law requiring competitive bidding, since the material or product specified was obtainable at a fixed price by any bidder and by the ultimate contractor on the successful bid.

In that case this court reviewed the former authorities and found that the rule adopted was supported by the great weight of authority, and that by agreement of the great weight of authority and modern text writers this rule is the better sustained by reason, citing McQuillin on Municipal Ordinances, Elliott on Roads and Streets, and many court decisions.

The plaintiffs here suggest that the cases involving patented products are not applicable in the same sense as cases involving products exclusively owned and controlled, but not patented. We conclude that such distinction is more fanciful than real. If one person exclusively owns and controls a certain product or material which is specified to be used in construction work, then, in so far as concerns the question of competitive bidding, what difference can it make whether such owner's exclusive control is based upon patent rights or upon the fact that he owns the only natural deposit of such material thus far discovered? Exclusive ownership either one way or the other is noticed as being the same in the following cases: Siegel v. City of Chicago (Ill.) 79 N. E. 280; Village of Rossville v. Smith (Ill.) 100 N. E. 292; Monaghan v. City of Indianapolis (Ind. App.) 76 N. E. 424.

In event of either such exclusive ownership, a bidder and contractor agreeing to do construction work and use that product or material must procure it from whence it is available, that is, from the exclusive owner. If A, by inventive genius, perfect a product and is the first so to do, then he exclusively owns the process until some one else should make the same discovery. He may prolong his exclusive ownership in certain cases by patent rights. If B, by prospective industry, discovers and becomes the owner of a natural deposit of a favorable substance and is the first to discover the same, then he likewise is the exclusive owner of such a product until

some other person with equal industry discovers another such natural deposit. Each ownership is exclusive within certain limitations. Indeed, if any distinction were made, we think we might more readily permit the use of exclusively owned natural resources or products than a patented article or product. The patented article is exclusively owned, and that exclusion is affirmatively protected by law, while the ownership which is exclusive by reason of being the only discovered natural source of supply is not protected in law and the exclusive character of that ownership may be destroyed any day by discovery of additional such deposits. It is not to be assumed that nature, in her great abundance to Oklahoma, had deposited at only one point in the state a deposit of asphalt, sandstone, or limestone in the proportions specified. It may be that up to this time no such identical deposit has been discovered. It is so alleged in plaintiffs' petition, and upon demurrer is taken as true, but, if so, the exclusiveness of that ownership of this material may be destroyed any day by the discovery of additional such deposits.

So that it seems that this court by its decision in Reed v. Rockliff-Gibson, supra, is committed to the proposition that the specifying of exclusively owned paving material does not necessarily violate the provision of law for competitive bidding, and from all the authorities the true rule must be that such specifications do not stifle, destroy, or hinder competitive bidding, if under the circumstances of the given case the bidding on the construction work with the use of the specified material is competitive.

A prospective contractor would hardly bid on any project without first ascertaining where he can obtain the iron, steel, gravel, asphalt, machinery, and supplies with which to perform the contract. If the specifications require a product exclusively owned, he would ascertain the cost of that portion of the material, as he would ascertain the cost of all other materials to be used by him in completing the project. What difference can it make to the bidders where, or from how many persons, the required material is obtainable, if it in fact is readily obtainable, and if it is obtainable alike by all bidders at a fixed price?

The plaintiffs' petition shows that this material is so obtainable, and there is nothing in the petition to indicate that the actual bidding on these projects was in fact stifled or hindered. After the bids were received and opened. there was no further

allegation or presentation of facts showing any such interference with competitive bidding. It seems that if any difficulty or hindrance had been encountered in the bidding, some prospective bidder would have observed it. We held in Reed v. Rockliff-Gibson, supra, that the competitive bidding provision was not violated, and upon that rule we must say that plaintiffs' petition here does not show any violation of the competitive bidding provision by reason of the specifications here involved.

We conclude that the weight of authority and the better reasoned cases follow the rule as contended for by the defendant, that the specifying of, or requiring the use of, a material produced exclusively does not necessarily violate statutory provisions for competitive bidding upon the construction project where the owner or producer of the material is not himself a bidder on the construction project and is ready and willing to sell his project to any bidder on the project at the same price.

We come now to another phase of plaintiffs' complaint which is not mentioned in plaintiffs' brief, but was stated in the original petition. That has to do with the price of the specified blended rock asphalt, and with the ultimate cost of the finishing coat of the roadway. The petition alleges, in substance, that the price at which the blended rock asphalt is sold by the producer thereof nets him an excessive profit per ton, and that with transportation cost added the ultimate cost of the roadway will be excessive. The plaintiffs assert that suitable artificially mixed asphalt, similar, and, as plaintiffs allege, as good as superior in quality to the natural product, can be furnished on road projects at a cheaper price per ton, and that if the specifications could be modified so as to permit the use of such material, the use of that material in the finishing coat of the roadway would amount to a substantial saving in the ultimate cost of the six construction projects.

The plaintiffs file an extensive brief citing many authorities and presenting their argument upon the theory that competitive bidding is not allowed on the specifications by reason of the specified material required to be used, but therein make no mention of the price or cost, and therein present no argument or contention thereon. Under the general rule we would be justified in treating that contention as abandoned, but, nevertheless, we deem it our duty to notice the allegations of the petition, since this is a public question and deals with the expenditure of public funds.

It is to be noted that the petition does not allege that the Highway Commission knowingly specified the use of a construction material of excessive cost to the taxpayers, nor that these specifications were prepared with the corrupt motive of permitting any excessive profit to be realized upon the natural material specified. In its final analysis this allegation of the petition is nothing more than an allegation that if the Highway Commission had permitted the use of another artificially mixed product, which the plaintiffs deem to be just as good or better than the natural product, a saving would thereby have resulted in the funds of the Highway Commission.

Our statute specifically authorizes the Highway Commission to designate the place where roads are to be built, the type of road construction, and the material of which the various roads are to be constructed. So we have roads in Oklahoma composed of various and different materials. The legislative intent is indicated that the Highway Commission would use its best judgment in each case as to the type of road to be built and the material to be used therein, and in the absence of fraud, corruption, improper motive, plain disregard of duty, gross abuse of power, or violation of the law, that discretion should not be interfered with or controlled by judicial power.

We have found that the act of the commissioners in submitting this project upon the specifications involved did not violate the competitive bidding requirement, and, therefore, was not in violation of the law. Surely our statutory provisions clothe the Highway Commission with power, in their sound judgment, to designate the particular product to be used in constructing the traffic surface of the roadway, and there is no allegation in the petition upon which it could be said that the commission was guilty of gross abuse of discretion or guilty of fraud, corruption, improper motive, plain disregard of duty, or gross abuse of its power.

It may be that the plaintiffs only intended these allegations in their petition to complement their allegations presenting their theory of violation of the competitive bidding requirement. That conclusion is indicated by the fact that these allegations are not referred to in plaintiffs' brief. Our statute and decisions furnish ample ground

for relief when any such act is unlawful, fraudulent, corrupt, or constitutes a gross abuse of power, but it can hardly be the rule that a citizen, although he is one among the multitude of the taxpayers of the state, may stop the progress of road construction work merely upon his allegation that his road building material or product, or some other product different from that required and specified by the Highway Commission, is just as good as the material specified, and can be procured and laid in road construction work at a lesser cost, resulting in a saving to the taxpayers. To so hold would violate the clear legislative intent that the Highway Commission should have control of the construction and maintenance of the highways. It may be that many governmental expenditures in the past and in the future could be reduced by the use of different, cheaper, or less expensive material, but in large measure that is always a question to be determined by the individual or board making the expenditure, and that item is not ordinarily a question for control by the courts. While the courts do freely act when a cause is presented justifying judicial interference, we do not find such facts presented here.

In Moore v. Porterfield, 113 Okla. 234, 241 P. 346, this court noticed the general rule that the discretionary powers of public officials would not be controlled by injunction, and there stated the exception to be that injunction would be issued only "in case of a gross abuse of such discretion, or where it appears that such action is founded on fraud, corruption, improper motive, plain disregard of duty, gross abuse of power, or violation of the law."

In Furgason v. Mitchell, 128 Okla. 232, 262 P. 500, we held:

"The proper officials are charged with the repair and maintenance of public highways, and, while acting in the scope of their authority, they are vested with a very broad discretion, with which courts will not interfere, by granting injunctive relief, except in cases of fraud, or where there is a manifest or gross injustice which would constitute an abuse of discretion."

In Hawkes v. Seay, 150 Okla. 160, 1 P. (2d) 148, we held:

"The State Highway Commission is created and vested with powers and duties necessary to fully and effectively carry out all of the objects of the act creating it, and when acting consistently with said act, it cannot be enjoined from using the funds in its possession and under its control in constructing and improving highways which it is authorized to construct and maintain, except such funds as are raised by the issuing of bonds or taxation for a designated purpose; such funds must be used for the purpose raised and designated."

The case at bar involves no such specially raised funds, but, on the contrary, concerns funds raised for the general road building program of the state, under complete supervision of the Highway Commission.

We conclude that the State Highway Commission has complete supervision and control of the construction and maintenance fund, and has both the duty and the right to use its own judgment and discretion in the character and type of road it builds, and that such discretionary power cannot be enjoined upon the facts alleged by plaintiff. This conclusion is supported by provisions of our statute in the following sections of O. S. 1931, to wit: 10089, 10091, as amended by chapter 22, S. L. 1933, 10106, 10124, as amended by chapter 167, S. L. 1933, Sess. Laws 1935, c. 50, art. 2, pages 211 to 212; and by the following additional citations of this court: Allen v. Board of Commissioners of Logan County, 131 Okla. 41, 267 P. 860; Leininger v. H. L. Cannady Co., 139 Okla. 301, 282 P. 474; Wentz v. Ingenthron, 146 Okla. 165, 294 P. 154; Boyle v. Rock Island Coal Mining Co., 125 Okla. 137, 256 P. 883, and Whittington v. Dyer, etc., 130 Okla. 38, 265 P. 126.

As to the specification requiring material from a two-year proven source of supply, we find that Kentucky has approved a five-year use test specification, and New York and Louisiana have both approved a two-year use test specification. See City of Springfield v. Hayden, Rederscheimer v. Flower, supra, and Berghoffen v. City of New York, supra.

For the reasons stated, it follows that the judgment of the trial court was correct, and it is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and PHELPS, CORN, and GIBSON, JJ., concur. RILEY and BUSBY, JJ., dissent. BAYLESS, J., absent.

RILEY, J. (dissenting). This action was instituted by taxpayers. The result sought is a writ of injunction to prevent the defendants, the officers of the State Highway Commission, from approving bids and executing contracts for furnishing materials and performing labor incident to a state highway project of paving roads. The specifications upon which the bids are

based, by indirection and description, limit the source of a material needed, "blended rock asphalt," to one place or mine (a pit located near Dougherty, Okla.), which place or mine is owned and controlled by one producer, the Southern Rock Asphalt Company.

The descriptions and designations contained in the specifications prepared by the State Highway Commission which bring about the restriction of the source of said material are:

(1) Requirement of a blended or mixed road material of which the elements are limestone and sandstone, naturally impregnated with asphaltic oil ("which material is not a standard road material as distinguished from other rock asphalt * * *").

(2) Requirement that the "sand rock asphalt and lime rock asphalt shall be blended while being crushed at the place of manufacture; all rock asphalts shall be used as mined with no preparation, other than blending, crushing, grinding and pulverizing," and "no fluxing material nor hard asphalt shall be added to bring the bitumen content within the specified limits."

It is alleged that the required blending at the pits serves no useful purpose in creating suitable rock asphalt, but that road construction would be equally if not better served through use of limestone or sand rock alone, mixed with proper proportions of liquid asphalt, and the result of such mixed materials is an asphaltic road building material of the same nature and ingredients as the so-called "blended rock asphalt," but of a superior quality, but that the submitted specifications requiring the use and blending in a plant located a long distance from the road project will entail the unnecessary expenditure of thousands of dollars in the payment of freight for transportation of rock and sand which is available in the vicinity of the road project.

(3) That the requirement that "a special crusher and pulverizer" shall be used in crushing the stone is indefinite and unreasonable and is calculated to confuse bidders and prevent free bidding.

(4) That "the rock asphalt for this item shall be material obtained from deposits which for a period of two years have been producing rock asphalt laid in pavement giving satisfactory service when blended in the general manner prescribed herein," that this requirement will confine and limit the source of material to the one mine so owned in the vicinity of Dougherty, Okla.

It is alleged that the unavoidable effect of said "special provisions" and specifications is to create a perfect monopoly in the furnishing of the blended output of the lime rock and sand rock pits operated by the Southern Rock Asphalt Company for road construction in Oklahoma. That the said specifications limit the asphaltic material to be used in the construction of said highway as definitely as if the same specifically required such production to be mined and mixed at the pits of the said Southern Rock Asphalt Company, in that no other pits anywhere other than the said pits meet said requirements.

That the actual cost of the product—the so-called "blended rock asphalt"—will not exceed $1.75 per ton, f. o. b. cars at Dougherty, Okla., but that all purchasers, other than favored ones, are required to pay to said corporation the sum of $4.25, f. o. b. at Dougherty, whereby the said corporation is enabled to influence and control bidding and to actually fix without competition the sale price of its product. That the profit of said corporation is approximately $2 per ton, or more than 120 per cent. That the average freight charge for transportation of said material to the road projects is $2.05 per ton, but that the asphaltic road material similar and superior to the so-called "blended rock asphalt" and of the highest grade can be furnished for construction of the road projects herein involved, and is being furnished for construction of similar road projects throughout the United States at a price not in excess of $3.25 per ton, delivered; that with an alternate use of standard asphaltic material in the construction of the projects here involved, a saving will be had in the cost of such road materials in the approximate amount of $59,000; that defendants in adopting and promulgating same (specifications) were guilty of flagrant violation of their official duty, and of sound discretion, and committed what in effect is a legal fraud upon the right of the plaintiffs and all other citizens of the state of Oklahoma.

Other appropriate allegations relating to relief were incorporated in the petition.

At the outset, it is fitting and proper that we as judges examine the rules of law by which our judgment will be moulded. If our measure or working tools are to be limited by a rule of strict construction or extended by a rule of liberal construction, we should be not only conscious of the fact, but also we should be aware of the underlying reason for the rule.

The majority opinion applies to the pro-

cedure, whereby such contracts are let by the State Highway Commission, a rule of liberal construction, and bases it on ample funds provided and broad powers vested. It is said:

"It seems beyond question that with such authority reposed in the Highway Commission, the rule of liberal construction should be applied. * * *"

But the majority would apply to a rule of strict construction where the cost is to be paid from special assessments. It is said:

"It must be true that the power of officers of the city in letting construction contracts where the cost is to be paid from special assessments would be far more restricted. * * *"

I am inclined to the view that if rules of construction are to be applied, exactly the converse of that stated by the majority should obtain. Because, under our law relating to paving in cities, the owners of real property benefited by the improvement may petition for the improvement, and thus initiate the movement, or they may protest and remove their property from the district improved; in any event they pay the bill and they should have voice in designating the particular material to be used. Whereas the State Highway Commission is already possessed of broad powers under the law, and there is no need to broaden these powers vested by a rule of liberal construction. Moreover, they deal with "other people's money," the funds belonging to the public, and as a consequence there is more need for circumspection as applied to these mere agents and servants of the people. The majority opinion relies upon the rules stated in other jurisdictions without an analysis of the reason for the rule. But Mr. Justice Brewer states this reason in Yarnold v. City of Lawrence (1875) 15 Kan. 126, after pointing out that the right of a city to avail itself of patent inventions in the improvement of streets, where the law required the letting of contracts to the lowest bidder, has been denied in Wisconsin, California, and Louisiana, and sustained in Michigan and New York; with meticulous care that great jurist showed that in Wisconsin and California special provision is made for securing to the lot owners the privilege of doing the work themselves—a privilege the courts consider of no value if the contemplated improvement is covered by a patent, and can only be made by the patentee, or such person as he chooses to permit. With us there is no such special provision relating to paving in cities, whereby the property owner may do or cause to

be done his own work, within a given period of time, and upon failure so to do the city may let a contract for construction of the improvement, as pertains to the case of sidewalks. Consequently there is no need for rules of construction relating to paving roadways whether liberal or strict, and withal courts should adopt such rules to warp their judgment only "cum grano salis."

The majority opinion cites Smith v. Syracuse Imp. Co. (N. Y.) 55 N. E. 1077, a special assessment case involving vitrified brick manufactured by the New York Brick & Paving Company, a common article not patented, but the subject of a complete monopoly by reason of the restrictive specifications, wherein the court held the proceedings void in that "it did not permit of free competition," for "while competition was to a certain extent allowed in this case, namely, as to the work required in paving the street, it was not allowed to the extent required by the statute, which contemplates a full and free competition in all things, inasmuch as competition in the price of paving brick was sought to be prevented," for by restricting the material to one producer, the New York Brick & Paving Company, the specifications necessarily allowed that corporation to practically "fix its own price for brick to be used in the work," whereas "vitrified brick for paving purposes is a common article of manufacture and sale," and it is a "well-known fact that many corporations manufacture and sell vitrified brick for paving purposes equal in quality to the best brick made by the said New York Brick & Paving Company." In view of this case it was said by the majority:

"It seems certain that at least in a special assessment case the authorities could not specify a paving product on the general market, manufactured by several competing persons, and specify that the product of only one, calling him by name, should be used in the construction work."

If this is a sound decision, and since rules of construction should not hedge our judgment, why should it not be applied in the case at bar? The evil condemned by the decision is monopoly—the counterpart of lack of competition in the bids in so far as the contract embraced the furnishing of materials common in use and not patented.

The majority, like the Court of New York in the cited case, takes judicial notice of the commonality of the article, in these words:

"It is not to be assumed that nature in her great abundance in Oklahoma, has de-

posited at only one point in the state a deposit of asphalt, sandstone or limestone, in the proportions specified."

But the arbitrary specifications limiting material to that in use for two years last past does that which nature failed to do, to wit, creates an artificial monopoly, and without just reason, for the vagaries of nature are such that no man can tell, without a particular examination, what the next foot of the mine pit will bring forth, nor if the deposit of asphalt continues, in what proportion it will be, whereas if a particular examination is made, a core drill on land other than that possessed by the Southern Asphalt Company will reveal as much and determine the value of the material as well for road construction as it would upon the property of the monopolistic organization that seeks to levy a tribute of more than 120 per cent. upon the present and possibly as much upon the unborn generations of Oklahoma.

Wherefore, I assert that requirement of two years operation of the mine pit is unreasonable and arbitrary.

The majority inquire as to what difference it can make to the bidder where the required material is obtainable, if it in fact is readily obtainable alike to all bidders at a fixed price? Remembering that this is a suit at the instigation of taxpayers, the query might be answered: None at all, but bearing in mind that even as applied to patented articles it is usually required that it affirmatively appear in writing filed with the letting agency that the owner of the legal monopoly agrees to a uniform, stable, fixed price, and a relinquishment of control, the inquiry of the majority assumes facts not in evidence in the case at bar.

Again the majority say:

"It is to be noticed that the petition does not allege that the Highway Commission knowingly specified the use of a construction material of excessive cost to the taxpayer, nor that these specifications were prepared with the corrupt motive of permitting any excessive profit to be realized upon the natural material specified."

But I warn that the result is the same, which is to say, in view of the allegations which we must accept as a verity, that the letting board in this instance was either a knave or a fool, and I recall that mighty dignitaries in this state have been convicted and removed from office under an article embracing the latter, more appropriately stated as incompetency (or not knowing).

The majority recite the substance of the petition in this regard:

"The petition alleges, in substance, that the price at which the blended rock asphalt is sold by the producer thereof nets him an excessive profit per ton, and that with transportation cost added the ultimate cost of the roadway will be excessive."

The majority decline to make a distinction between the use of patented products and materials exclusively owned. It is said that:

Such distinction is more fanciful than real; and that if any distinction were made it might more readily favor exclusively owned natural resources or products than patented articles or products, for that the patented article is protected by law, whereas the exclusively owned natural products have no protection in law "and the exclusive character of that ownership may be destroyed any day by discovery of additional such deposits."

Which is to say that a monopoly of common materials is neither protected by law of the state, patent issued by the federal government, nor by nature. Wherefore, the court should afford protection and perpetuity to the parasite that feeds bounteously upon the store of the people's wealth "and eats out their substance."

I can subscribe to no such doctrine. I am oath-bound to the contrary view by the highest of mandates:

"Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed." Section 32, art. 2, Constitution of Oklahoma.

Revocable permit law held void: Oklahoma Natural Gas Corp. v. State, 141 Okla. 80, 284 P. 40; City of Cushing v. Consolidated Gas Utilities Co., 141 Okla. 82, 284 P. 38. See, also, sec. 44, art. 5, Constitution; State v. Cameron & Co., 147 Okla. 1, 294 P. 104.

I am by faith bound to the contrary expressed in biblical injuction:

"He that withholdeth corn, the people shall curse him; but blessing shall be upon the head of him that selleth it." Proverbs 11-26.

See, also, Amos 8, 4-10; Job 29, 11-17.

The Legislature has defined and condemned combinations in restraint of trade or commerce as monopolies. Chapter 68, art. 1, O. S. 1931. The state of the record here shows a virtual monopoly and affects the community at large as to supply, demand, and price. Therefore, there is no

assurance that the Southern Asphalt Company will continue in its present state so as to guarantee price or production for the completion of this project, for, as stated in Oklahoma Portland Cement Co. v. State, 87 Okla. 282, 210 P. 1031:

"The statute, however, does authorize the state to interfere with the distribution of commodities when the same are bought or sold or taken by purchase or sale in such a manner as to constitute a virtual monopoly, or to affect the community at large, as to supply, demand, price, or rate thereof."

See, also, State ex rel. Dabney et al. v. William Cameron & Co., Inc., 147 Okla. 1, 294 P. 104.

Section 32, article 2, Constitution, supra, inhibiting monopolies, is said by Judge Williams in his annotated Constitution, at page 50, to be self-executing. We so considered it in City of Okmulgee v. Okmulgee Gas Co., 140 Okla. 88, 282 P. 640, and said:

"* * * The framers of our Constitution held a strong conviction against monopolies and perpetuities and favored encouraging just competition, as shown by clauses, paragraphs and sections of our organic law." (p. 97.)

Therefore, it is obvious that monopolies are odious, contrary to public policy, and unfavored in law and judicial decisions.

"There is a line of cases which broadly holds that where an article is monopolized, no matter whether legally or not, as under a patent, and the statute provides that work of public improvement shall be let to the lowest bidder (such as sec. 10095, O. S. 1931, and S. L. 1933, p. 50), such monopolized article cannot be used, for the reason, first, that monopolies are odious in law, and second, because without free competition there is always opportunity for favoritism, fraud, graft, and oppression. The leading case on the subject is Dean v. Charlton, 23 Wis. 590, 99 Am. Dec. 205. This has been followed in other states. See Siegel v. Chicago, 223 Ill. 428, 79 N. E. 280, 7 Ann. Cas. 104; Monaghan v. City, 75 N. E. 33, 37 Ind. App. 280, 76 N. E. 424; Nicolson Pav. Co. v. Painter, 35 Cal. 699; State v. Elizabeth, 35 N. J. Law, 351; Burgess v. City, 21 La. Ann. 143; Fones Hdwe. Co. v. Erb, 54 Ark. 645, 17 S. W. 7, 13 L. R. A. 354; Fineran v. Central Co., 76 S. W. 415, 3 Ann. Cas. 741, 116 Ky. 495; Smith v. Syracuse Co., 161 N. Y. 484, 55 N. E. 1077; Barber Co. v. Gogreve, 41 La. Ann. 251, 5 So. 853; Diamond v. City, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448.

"On the other hand, many courts have held that a statute providing that work shall be let to the lowest bidder does not prejudice the use of patented articles. The leading case on this side of the question is Hobart v. Detroit, 17 Mich. 246, 97 Am. Dec. 185, opinion by Cooley, J. This has been followed in State v. Shawnee County, 57 Kan. 267, 45 P. 616; Holmes v. Council, 120 Mich. 226, 79 N. W. 200, 45 L. R. A. 121, 77 Am. St. Rep. 587; In re Dugro, 50 N. Y. 513; Rhodes v. Board, 10 Colo. App. 99, 49 P. 430; Swift v. City, 180 Mo. 808, 79 S. W. 172; Mayor v. Flack, 104 Md. 107, 64 Atl. 702; Field v. Barber Asphalt Co. (C. C. A.) 117 Fed. 925; Id., 194 U. S. 618, 24 S. Ct. 784, 48 L. Ed. 1142; Bunker v. City, 74 Kan. 651, 87 P. 884; Bye v. Atlantic City, 73 N. J. L. 402, 64 Atl. 1056; Mayor v. Bonnell, 57 N. J. L. 424, 31 Atl. 408; Schuck v. City, 186 Pa. 248, 40 Atl. 310; Mayor, etc., Baltimore v. City of Raymo, 68 Md. 569, 13 Atl. 383; Yarnold v. Lawrence, 15 Kan. 126, opinion by Brewer, J; Hastings v. Columbus, 42 Ohio St. 585; Monaghan v. City, 37 Ind. App. 280, 76 N. E. 425; Perine v. Quackenbush, 104 Cal. 684, 38 P. 533. * * *

"In each of the leading cases above cited there was a strong dissenting opinion, and in view of the decided conflict in the opinions of able courts and judges, it is manifest that cogent reasons may be given in support of either conclusion." Hoffman v. Muscatine (Iowa) 232 N. W. 430, 77 A. L. R. 680, at p. 687.

Oklahoma permits the use of patented materials (Reed v. Rockliff-Gibson Const. Co., 25 Okla. 633, 107 P. 168) where an affirmative written showing of uniform price and relinquishment is filed with the city clerk, and the owner of the patented article is not a bidder. But nowhere has our state countenanced an illegal monopoly. I hold there is a vast and valid distinction and that the difference is not fanciful, but real.

In the cited case, Hoffman v. Muscatine, supra, this distinction is made:

"It must be remembered that the monopoly in this case, if one exists, was created by the government. It is not one which is odious in the eye of the law, for it was granted by the public as a stimulus to inventive genius, and to preserve to the individual the fruits of his discovery.

"That thought may be stimulated for the public good, new and useful inventions are patentable, and the discovery is given the exclusive right to use his invention for a limited period of time.

"While there are artificial monopolies which are odious in the eye of the law, it seems clear that one created by the government for the purpose of fostering use-

ful discoveries is not such as courts should discredit."

The converse must also be true. We are dealing not with a monopoly created by the government as in the case of patents, where the law allowing them is available to all alike, nor are we dealing in grants from the sovereign, but with one constructed and countenanced by mere administrative officers whose duty it is under the law to require competition in all such contracts and in each constituent element thereof. Such an artificial monopoly is odious in the eye of the law. The Constitution and the statutes do not foster or protect it, and as a consequence the judgment of this court should not lend it favor. Nor protect it. The very statute under which the commission acts requires competition, which is the antithesis of noncompetition, or monopoly.

If the material, or part of it, to be furnished under the proposed contract is monopolized, there cannot, of course, be absolutely free competition. The statute providing for letting of public improvement to the lowest responsible bidder was enacted to secure competition, to prevent fraud and to defeat graft. It was enacted to remove as far as possible all favoritism and to secure the performance of public work at the lowest possible price, which end is shown to be thwarted by allegations in the petition now before us, that the excessive cost by reason of this admitted monopoly is approximately $59,000. If it is countenanced, there is no telling the consequences to the present and future generations.

This is a fraud because:

"Fraud in a court of equity properly includes all acts, omissions, and concealments which involve a breach of either a legal or equitable duty, trust or confidence justly reposed and are injurious to another or by which an undue unconscientious advantage is taken of another." Dickinson v. Stevenson, 142 Iowa, 567, 120 N. W. 324.

Even in the cases of the use of patented articles, competition may be had as required by statute by specifying the use of several materials. This is now required by statutes in many states.

In Kratz v. Allentown (Pa.) 155 Atl. 116, it was held that a municipality had the right to call for stone of a particular quality and fitness, but not from a particular quarry. As otherwise it might create a monopoly and prevent competitive bidding. This rule of law was stated in the fourth paragraph of the syllabus in that case.

The result shown in the case at bar by the indirection and circumlocution of the proposal is contrary to the rule.

In Lamborn v. Hutton, 132 Kan. 226, 294 P. 676, where the specifications did not designate the machine to be used for compacted concrete pavement, nevertheless, the result required such use, the court, after citing the statute requiring competitive bidding, said:

"The purpose of these sections of the statute was to prevent graft and fraud in municipal construction work, and they are to be liberally construed."

The court condemned the proceedings, saying:

"To recognize the contract as valid is to open the door to future accomplishment by indirection of results which the Legislature sought to prevent."

Our sister state was adamant. National Surety Co. v. Kansas City H. P. Brick Co., 73 Kan. 196, 84 P. 1034; Pollock v. Kansas City, 87 Kan. 205, 123 P. 985, 42 L. R. A. (N. S.) 465.

Chief Justice Fuller, speaking for the Supreme Court of the United States, in United States v. E. C. Knight Co., 156 U. S. 1 (1895), Va. Law Register, vol. 1, p. 716, 39 L. Ed. 325, makes reference to the meaning of the word "monopoly" at common law, and to the larger significance given to the term in modern times, whereby it is not confined to a grant or commission from the King (or other power), but is applied to other situations relating to buying, selling, making, working, or using of anything whereby anyone is sought to be restrained of any freedom he had before, or is hindered in his lawful trade. The highest court took it as a concession that the existence of a monopoly was established by the evidence.

So that the distinction between monopolies lawful, as represented by the government grant of letters patent, and a monopoly unlawful and odious in the eye of the law, as represented by materials common in usage and bounteously supplied by nature, is real and recognized as such by respectable authority.

"A monopoly * * * is withdrawing that which is a common right from the community, and vesting it in one or more individuals, to the exclusion of all others. Such monopolies are justly odious, as they operate not only injuriously to trade, but against the general prosperity of society." Charles River Bridge v. Warren Bridge, 36 U. S. 420, 9 L. Ed. 773.

"Courts of last resort have generally refrained from propounding an authoritative affirmative definition of the 'monopoly' so odious to the common law and to the genius of a free government. It would try the power of expression of most judges, if not of human speech, to frame such a definition outside of which a grant or contract must wholly and clearly rest to escape the stroke of nullity." City of Laredo v. Int. Bridge & T. Co., 66 Fed. 246, 14 C. C. A. 1.

But the elusive object is admittedly before this court by virtue of the rule of liberality with which we consider the allegations contained in a petition when tested by a demurrer.

Our territorial court in Guthrie Leader v. Cameron, 3 Okla. 677, 41 P. 635, isolated the detestable thing and defined it as an exclusive privilege not enjoyed by others— an act of doing all the printing required by the state and requiring all officers of the state to have their printing done by such company.

It has been held that:

"Monopoly of trade embraces two essential elements: (1) The acquisition of an exclusive right to or the exclusive control of, that trade; and (2) the exclusion of all others from that right and control." U. S. v. Trans-Mo. Freight Ass'n, 58 Fed. 58, 7 C. C. A. 15, 24 L. R. A. 73.

LaFollette said:

"These trusts, clothed with corporate power, availing themselves of every advantage of the law, yet living and growing in greatness and power in violation of it, constitute a national and interstate problem that must be dealt with fearlessly and effectively."

He pointed out that in St. Louis they organized "to boodle the city with their criminal compacts for secrecy that would chill the blood of common cutthroats."

Governor Altgeld said:

"Having learned what vast sums can be extorted from the American people, the monopolies used a part of the wealth they got from this source to corrupt the people's representatives, and thus obtained unlimited privileges of plunder, until almost every great city in this country is tied and gagged, and cannot even enter a protest while being robbed."

He said:

"* * * The most serious problem that confronts the people of America today is that of rescuing their cities, their state and the federal government, * * * from absolute control of corporate monopoly. How to restore the voice of the citizen in the government of his country, and how to put an end to those proceedings in some of the higher courts which are farce and mockery on one side, and a criminal usurpation and oppression on the other."

In Flynn Construction Co. v. Leininger, 125 Okla. 197, 257 P. 374, this court construed sections 10091, 10093-10095, O. S. 1931, requiring that highway construction contracts be let to the lowest responsible bidder, and determined that the statute required competitive bids on all items comprising the contract. There, time of construction was an item omitted from the specifications, and upon which the bids were not competitive. Here, competition is utterly lacking in the cost of "blended rock asphalt," the furnishing of which is an integral part of the contract upon which bids were submitted. The cost of the common material is exorbitant and the product is exclusively owned and the price is fixed and said to be uniform. We held in the cited case:

"It is true that this commission is vested with broad powers and discretion, but it is true also that the exercise of such powers and discretion must not be inconsistent with the act itself nor with other laws of the state. * * * Hence, the commission is without authority to omit an essential element from the bids."

See, also, Leininger v. Ward et al., 126 Okla. 114, 258 P. 863.

Who denies that the asphaltic material is one of the principal elements or items of this contract for construction? Who denies that there is no competition in the furnishing of this material?

It is urged by the majority that the commission might exercise the powers of eminent domain and requisition this material, and such is admitted by all. But it must be remembered in such cases there is a final evaluation by a commission or a jury under supervision of a court of justice, and not an arbitrary tare or fixing of price by the owner of the monopoly.

This dissenting view was sustained in Fishburn et al. v. City of Chicago (Ill.) 49 N. E. 532, wherein the city of Chicago specified materials prepared from refined Trinidad asphaltum obtained from Pitch Lake. After citing the cases of City of Chicago v. Rumpff and City of Chicago v. Turner, 45 Ill. 90, it was said:

"The conclusion of the court was that the ordinance then under consideration tended necessarily to create a monopoly, and was therefore void; and the doctrine of the

case is approved in People v. Chicago Gas Trust Company and Foss v. Cummings, supra."

These words were used by the Illinois court:

"If the requirement that the asphaltum to be used in the improvement should be obtained from Pitch Lake, in the island of Trinidad, tended to restrict competition among those who might desire to become bidders for the performance of the work of improving the street, or tended to create a monopoly in favor of any one having for sale the asphaltum necessary to be used in the work of paving the said street, it would fall under the ban of this general rule of the law, and must be declared inoperative and void. It does not appear from the face of the ordinance that the effect is necessarily so to prevent competition or create a monopoly; but the proffered proof, which the court excluded, unmistakably disclosed that the asphaltum required by the ordinance to be used in making the street was a product which could only be obtained by purchase from a single corporation. The direct effect of the requirement, therefore, was to create a monopoly in favor of that corporation, and to restrict competition in bidding accordingly."

The court further said in substance that the asphalt offered by the Barbour Asphalt Company did not have any superior or legal rights in the markets, and no preference could be given to it under the specifications, but that the Barbour Asphalt Company should depend upon its merits for any monopoly that it might obtain.

"But it may be said that cities, in the construction of public improvements, ought to have, as have individuals in the construction of private structures, the right to select for use the article or substance best fitted and adapted to the purpose, and that to deprive the public of the right to select and use such superior articles is opposed to public policy, and positively disadvantageous to the public. The force of this argument must, of course, be admitted; but upon reflection it is readily seen it is not necessary to foster and create a monopoly, and prevent competition in the letting of public contracts, by providing in ordinances that a certain substance or article, and no other shall be used. If it be the judgment of the city council that the most suitable and best material to be used in any contemplated improvement is the product of some particular mine or quarry, or some substance or compound which is in the control of some particular firm or corporation, the ordinance might be so framed as to make such production, substance, or compound the standard of the quality and fitness, and to require that material equal in all respects to it should be employed. An ordinance making it indispensable that an article or substance in the control of but a certain person or corporation shall be used in the construction of a public work must necessarily create a monopoly in favor of such person or corporation, and also limit the persons bidding to those who may be able to make the most advantageous terms with the favored person or corporation. If all the ordinances adopted by the city council of the city of Chicago providing for the paving of streets and public places in the city should select the stock in trade of a particular firm or corporation as the only material to be used in making such street improvements, the evil would be intolerable; and, if they may lawfully select such article in one ordinance, it cannot be unlawful to make it the settled policy of the city that material for paving streets shall be purchased of but one seller."

From the above it may be seen that this case presents a situation that is clearly parallel with the facts in the present case, both bids being required to be let to the **lowest responsible bidder.**

In so holding the Supreme Court of Louisiana in Redersheimer v. Flower, Mayor, et al., 52 La. Ann. 2089, 28 S. 299, used the following language:

"Plaintiff, a citizen, taxpayer, and owner of land on the street it is proposed to pave, instituted this action and sued out an injunction to prevent defendants from carrying out a contract for the paving with asphalt of St. Charles street, from Canal street to the terminus of the present asphalt pavement around Lee Circle. The grounds of complaint are that defendants required, in the proposal for bids, that all rock asphalt used in the pavement be mined from one or more of the deposits. * * * The proposal was for the construction of a pavement of sheet or rock asphalt, the one being considered of equal value to the other, and the specifications, as relates to the proposals for bids, were intended for both. They were both treated as being on the same footing and as being of equal grade. It appears that the difference between the two, the rock and the sheet asphalt, is not considerable. The sheet asphalt has very nearly the same proportion of ingredients as the rock asphalt. When laid in a pavement, they amount, as relates to use, to about the same thing. One is the natural product of the mines, and the other is artificial—an imitation of equal value to the original. * * *

"The testimony shows that the material in question is of a superior quality. The

difficulty grows out of the fact that it is obtained from one of the few mines mentioned in the specifications (that is, by special mention in the specifications), and in that way, plaintiff urges, competition was stifled. It is true that rock asphalt is obtained in large quantities in many places. It is also true that it varies in its composition, and that much of it is of inferior quality. For this reason defendants contend, in support of the specifications which plaintiff asserts are offending and injurious, that a standard must be adopted in order to protect the city against worthless materials. We are not inclined to deny the truth of the proposition. In view, however, of the provisions of the charter requiring competition in matter of bids, we are disposed to think that the specifications in question should be expanded a little and liberalized somewhat. While the lowest bidder should not be afforded the opportunity of using untried and worthless materials, on the other hand, the standard or grade of materials required should be broad enough to embrace, if not absolutely all, at least a goodly portion, of the first-class material offered for sale. Rock asphalt is not res incognita. It has been known from time immemorial, and surely a standard of quality can be adopted without limiting bids to three or four mines. We are informed by the evidence that the foreign product of the rock-asphalt mines referred to was selected chiefly for the reason that domestic rock asphalt has not given satisfaction as a pavement. None the less, we do not find in the record sufficient reason for excluding all mines save those mentioned in the specifications. There are many other mines than those before mentioned which produce a pure and durable quality of rock asphalt. Even domestic rock asphalt, although it has not yet found its way freely into the markets, is entitled to a hearing.

"The specifications set forth that 'all rock asphalt used in this pavement must be natural, bituminous, limestone rock mined from one or more of the natural deposits.' * * * This positively excludes all rock asphalt * * * save that before named."

The Supreme Court of the United States in Butchers' Union Slaughter House and Co. v. Crescent City Livestock & Co., 111 U. S. 746, 28 L. Ed. 585, 4 S. Ct. 652, condemned these institutions in the following language:

"Monopolies are the bane of our body politic at the present date. In eager pursuit of gain they are sought in every direction. They exhibit themselves in corners, in the stock market and produce market, and in many other ways. If by legislative enactment, they can be carried into the common avocations and callings of life, so as to cut off the right of the citizen to choose his avocation, the right to earn his bread by the trade which he has learned, and if there is no constitutional means of putting a check to such enormity, I can only say that it is time the Constitution was still further amended."

Judge Story said that a monopoly was: "An exclusive right granted to a few, of something which was before of common right." Charles River Bridge v. Warren Bridge, 11 Pet. (U. S.) 420, 9 L. Ed. 773.

Happily, as I see it, the statute here applicable, requiring competition in all things, supplements the constitutional inhibition against monopoly, vitalizes it in the event it is not self-executing, and applies the test to all contracts to be let by the Highway Commission, thus striking down specifications upon which contracts are to be based that have the effect of perpetrating a legal fraud upon a people.

"Such monopolies," says Thompson on Corporations (2d Ed.) vol. 5. p. 363, "are justly odious, as they operate not only injuriously to trade, but against the general prosperity of society." Again he says (p. 364):

"So contracts which tend to prevent competition between those engaged in public employment, or business impressed with a public character, is opposed to public policy and void. * * * It is conceded that monopolies may be created; but it is said that they must be called into being by the sovereign power alone (and not by administrative officers). They are regarded contrary to the genius of a free government, and should not be encouraged by the people or countenanced by the courts, except when expressly authorized by positive law" (such as in the case of patents); "and in many of the state Constitutions, the grants of monopolies are expressly forbidden."

"The rule is that all contracts in which the public are interested which tend to prevent competition, where the law requires competition, are void." Fishburn v. Chicago, 171 Ill. 338, 49 N. E. 532, 63 Am. St. Rep. 236, 39 L. R. A. 482.

In the case at bar, I do not find it at all necessary to invade the discretion vested in the State Highway Commission to select the most desirable road material available, whether natural or manufactured, establish a standard and require all bidders to conform to that standard, but when specifications are so narrowed by that board, as in the case at bar, so as to embrace a monopoly contrary to the public policy

expressed in Constitution and statute, it is manifest that the state agency has committed a gross abuse of discretion, indulged a fraud upon the taxpayers of the state, founded an institution that leads to corruption, indulged improper motives by stifling competition, plainly disregarded its duty, grossly abused its power and violated the law. The judgment of the district court should be reversed, with directions to grant the injunction.