(50 South. 663.)

No. 17,919.

SAXON v. CITY OF NEW ORLEANS et al.

(Nov. 15, 1909.)

1. MUNICIPAL CORPORATIONS (§ 993*) — INVALID CONTRACT—ACTION BY TAXPAYER.

A taxpayer has the right to come into court to enjoin the execution of a paving contract, which has been adjudicated without affording opportunity for competition, unless the property holders, by their petition, fix the price for a patented pavement, or a pavement containing a proprietary ingredient.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2158–2161; Dec. Dig. § 993.*]

2. MUNICIPAL CORPORATIONS (§ 330*)—CONTRACTS—COMPETITIVE BIDDING.

There can be no competition in the bidding on a paving contract, where the specifications require that the material of which the pavement is to be made, in whole or in part, composed, shall be that manufactured by a named company, which is left at liberty to bid, and which does not bind itself to sell its products at a fixed price to any and all bidders.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 855; Dec. Dig. § 330.*]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by Lyle Saxon against the City of New Orleans and another. Judgment for defendants. Plaintiff appeals. Reversed.

Lyle Saxon, in pro. per. I. D. Moore, City Atty., and John J. Reilley, Asst. City Atty., for appellee City of New Orleans. Saunders, Dufour & Dufour, for appellee Metropolitan Const. Co.

## Statement of the Case.

MONROE, J. Plaintiff applied to the district court for a writ of injunction to restrain the city of New Orleans and the Metropolitan Construction Company (of Kansas City) from further proceeding in the matter of the paving by that company of City Park avenue, from Bayou St. John to Canal street, with "mineral rubber asphaltic cement, known as 'Sarco road compound,'" and manufactured by the Standard Asphalt Rubber Company, of Chicago. After hearing, on rule nisi, the writ was denied, and plaintiff has appealed. He brings the suit as a citizen of New Orleans, a property holder, and a taxpayer, and alleges that the mayor, authorized by an ordinance to that effect, is about to sign a contract for the paving in question, and that the contractor is about to take possession of the street and proceed with the work; but it was shown, on the trial of the rule, that the contract had been signed on the day preceding that upon which the application was made, though no work had actually been done up to the time of the trial. Plaintiff further alleges, in substance, that the "Sarco road compound, manufactured by the Standard Asphalt Rubber Company, of Chicago," called for by the specifications, is the subject of a trade-mark, and is manufactured and controlled exclusively by the Standard Asphalt Rubber Company; that no one could bid upon a contract requiring the use of that material without the consent of that company; that there could, therefore, be no competition in the bidding, and, in fact, that there was no competition, the defendant the Metropolitan Construction Company having been the only bidder; and that

the proceedings leading up to the contract were violative of the city charter, as amended, and of Act No. 59, p. 66, of 1908, which contemplates that, where a patented pavement is to be laid, the proprietor shall file a written stipulation with the city to sell the right to lay the same to any contractor for a stipulated royalty. The city, for answer to the rule, alleges that the pavement in question was petitioned for and advertised, agreeably to the provisions of Act No. 59 of 1908, and that no protest was filed, pending the advertisement; that the Metropolitan Construction Company submitted the only bid, and the contract was awarded to it; that its bid compares favorably with the bids of other contractors for similar work; that plaintiff owns no property on the street to be paved, and that his interest in the contract, as a general taxpayer, is too small to entitle him to consideration; that the Sarco road compound is not a patented article, and, though manufactured exclusively by the Standard Asphalt Rubber Company, of Chicago, may be purchased by any contractor, in open market, without discrimination; that it will constitute but 8 per cent. of the pavement to be laid; and that the requirement that said material should be used was not inserted in the specifications in order to stifle competition, but (1) to insure the use of a standard, high-grade asphalt cement and (2) to notify the public that such cement was manufactured by the Standard Asphalt Rubber Company, of Chicago, so that any person, firm, or corporation, desiring to bid for the work, could be advised where the said cement could be purchased, and could—

"at once communicate with the said company and purchase the material * * * in the open market, without discrimination as to time, place, or price. thus placing all prospective bidders on an equal footing," etc.

It was admitted on the trial of the rule:

"That plaintiff is a general taxpayer * * * for the amount set forth on said [assessment] roll, and that he is not an abutting proprietor,

nor has he any interest, direct or indirect, in any property situated along the street where the contemplated paving is to be made, and, therefore, cannot be called on to contribute directly to the assessment for said paving."

Being called to the stand, by defendant, as a witness, plaintiff was asked:

"Are you aware of the fact that the assessment rolls show that the extent of your interest in this contract is $2.78?"

To which he replied:

"I am, sir. I will object to any questions along that line, on the ground that, as a general taxpayer, I have a right to come into court and protect my interest. irrespective of the amount of taxes I am paying to the city."

The court appears to have made no ruling on this objection, nor was any requested; and counsel for defendants made no objection, reserved no bill, and asked no further questions. The contract entered into between the city and its codefendant purports to be a contract for paving with mineral rubber Sarco asphalt, and calls for "mineral rubber asphaltic wearing surface, employing concrete foundation six inches in thickness." The specifications read, in part, as follows:

Mineral Sarco Asphaltic Wearing Surface.

"(82) Asphaltic Cement. Mineral rubber asphaltic cement shall be Sarco compound, manufactured by the Standard Asphalt & Rubber Company, of Chicago, Ill.

"(83) Wearing Surface. (a) The wearing surface shall be formed of a binder course of asphaltic cement and mineral rubber asphaltic concrete, composed of the foregoing described asphaltic cement and carefully selected, sound, hard, cracked stone, sand, and mineral dust, furnished with a squeegee course of pure asphaltic cement, surfaced with hot torpedo sand. * * * "

It is alleged in the petition that the contract will call for an expenditure of about $200,000, and, as the "principal assistant city engineer" estimates the proportion of the cost which is to be borne by the city at $155,000, it is probable that plaintiff's allegation is not far astray. The same officer, being asked: "You are not prepared to say that there are not other asphalts of similar nature as the Sarco road compound?" replied,

"I am not." And he further testifies as follows:

"Q. You say it is not a patent asphalt? A. The pavement is not. Q. It is a trade-mark named asphalt? A. Well, if you want to call—yes, it is a trade-name. Q. As I understand, Sarco, as I infer from the book, means the initials of the Standard Asphalt & Rubber Company—that would spell Sarco? A. Well, if the book says so."

Stanton Palmer, the president of the Metropolitan Construction Company, being asked: "Is any member or any officer of the Metropolitan Construction Company directly or indirectly interested in the other company?" replied, "No stockholder in the Metropolitan Construction Company is, as far as I know, a stockholder in the Standard Asphalt & Rubber Company." He further testified that, before the contract in question was awarded to his company, he had no agreement or understanding with the Standard Asphalt & Rubber Company, which would give to his company any preference or advantage in the purchasing of material, and, in fact, that he had not, up to the time of giving his testimony, conferred with the Standard Company in regard to such purchase. Being asked: "What is the Sarco cement?" he replied: "It is used in the making of mineral rubber pavement, so called. That is simply the name of the form of paving." And he is further questioned and answers as follows:

"Q. Now, Mr. Palmer, in what does this mineral rubber pavement differ from the ordinary asphalt pavement? A. Both in the character of the mineral aggregate and in the character of the binder used. Q. Can that dissimilar result, different from other pavement, be acquired by the use of any other cement but the Sarco mineral cement? A. No, sir. * * *. Q. Now, in this letter [referring to a letter which had been addressed to the city by another paving company, protesting against the letting of the contract in question under the specifications as drawn, on the ground that they prevented competition and shut out other cements equally as good as, or superior to, the Sarco] they speak of the 'Obispo,' 'Pioneer,' 'Hydrolene,' and 'Pittsburgh.' Do you know anything about these cements? A. I know all of them, from experience. Q. Can any of them be used, 'equally as good as, or superior to,' the cement in question?

A. Well, they might be employed for the making of the pavement. I want to qualify the answer that way. They could not be employed for the making of the mineral rubber pavement. * * *
"Q. But this particular cement is the only cement that could be employed in making this particular character of pavement? A. Yes, sir; and to make it as good as we want to make it. * * * Q. You know, as a fact, that this cement is an open market product—can be bought by anybody, for any purpose, don't you? A. I know that as an absolute fact; yes, sir. * * * Q. They [referring to the Standard Asphalt & Rubber Company] are the only people who manufacture and sell it? A. As far as I know, they are. Q. If there were others, would you know it? A. I think I would; yes, sir."

He further testifies that the ingredients of the Sarco may be purchased in open market, but that the Standard Company has a method of manufacture which, he presumes, is "as well guarded as the secrets that control the grade of the product of any factory." He further testifies that the Sarco road compound will constitute about 8 per cent., or 9 per cent., of the whole pavement. We may add here that we infer, from the testimony of the witness, that, when he says that the Sarco road compound is an "open market product" and can be bought by anybody, he means to say that the Standard Company, which manufactures and controls it, will sell it to anybody, but he does not mean to say that it is kept in stock by dealers in cement generally, or that contractors or others who need it in quantities can buy it from any one else than the Standard Company, or that any one else has the power to fix the price. It otherwise appears that, prior to the awarding of the contract here in question, a protest was filed by another paving company (as heretofore stated), which was followed by a protest, on similar grounds, from the plaintiff, in his capacity as citizen and taxpayer, but there is nothing which connects the plaintiff with the protesting paving company.

### Opinion.

On the face of the record, we should be obliged to hold that plaintiff is in court to

represent his own interest, and not as an interposed person. Moreover (being his own attorney), he says in his brief:

"The fact that the California Asphalting Company filed a protest with the mayor and city council against the letting of this contract to the Metropolitan Construction Company, on the ground that it violated the city charter, should not be construed against the plaintiff, on the supposition that he is representing this company; for, in truth and in fact, plaintiff denies most emphatically that he had anything whatsoever to do with this corporation, and that he appears in court as a taxpayer for the purpose of contesting the letting of this contract and any work thereunder on the ground that it is violative of the city charter and calculated to stifle competition and create a monopoly in favor of the Standard Asphalt & Rubber Company, of Chicago, Ill."

He also says:

"It is urged that none of the property owners along City Park avenue are complaining; hence plaintiff, a single taxpayer, should not be allowed to tie up a great public improvement. The court will note, from the record, that the city of New Orleans owns more of the property along the street than all the property owners put together. Therefore, if there was ever a case wherein a taxpayer should complain, this is one, because the city will pay the largest proportion for the pavement of this street, which will, necessarily, fall upon the taxpayers in general, and their interest is to see that there should be competition in the letting of this contract, as well as all public contracts affecting the city."

Whatever, therefore, might be the conclusion, if it were shown that plaintiff, had been employed by a possible competitor of the Metropolitan Construction Company to bring this suit in its interest (conceding, arguendo, that evidence to that effect would be admissible), we find nothing in the case as presented upon which to base the assumption that he has come before the court to represent any other interest than his own. The fact that his specific pecuniary interest in the matter to be determined amounts to only $2.78 (or $2.67, as the case may be) does not affect the question of his right to appear and stand in judgment; the amount involved in the contract of which he complains being far in excess of that required to give jurisdiction to the district court and to this court.

"In this country," says Judge Dillon, "the right of property holders, or taxable inhabitants, to resort to equity to restrain municipal corporations from transcending their lawful powers, or violating their legal duties, in any mode which will injuriously affect the taxpayer, * * * has, without the aid of statutory provisions to that effect, been affirmed, or recognized, in numerous cases in many of the states. It is the prevailing, we may now add, almost universal, doctrine on this subject." 2 Dillon's Mun. Corp. (4th Ed.) p. 1106, § 914 (731); Handy et al. v. New Orleans et al., 39 La. Ann. 107, 1 South. 593; Conery v. Waterworks Co., 39 La. Ann. 770, 2 South. 555.

That the letting of a contract for public work, where there can be no opportunity for free competition (as where the pavement is to be laid with a patented or proprietary article) by a municipality whose charter requires that such contracts shall be adjudicated to the lowest bidder, is unlawful, and that the carrying out of such a contract may be enjoined by a property taxpayer, are propositions which have, more than once, been decided by this court. Burgess, Bennett et al. v. City of Jefferson et al., 21 La. Ann. 143; Asphalt Co. v. Gogreve, 41 La. Ann. 251, 5 South. 848; Redersheimer v. Mayor et al., 52 La. Ann. 2089, 28 South. 299; Bacas v. Adler, 112 La. 813, 36 South. 739; Lacoste v. City of New Orleans et al., 119 La. 469, 44 South. 267. All the cases thus cited, save the first, refer to the charter of the city of New Orleans, and we do not find that it has been changed (with respect to the matter under consideration) save in the following particular, to wit: In amending and re-enacting section 104 of the charter (Act No. 45, p. 77, of 1896) the lawmaker has added the proviso:

"Provided, further, that the city, whether by petition or otherwise, can lay any patented pavement, provided that the owner of the patent will file a written stipulation with the city to sell the patent rights to any contractor, for a stipulated royalty, or, the property holders petition for said patented pavement, and provide, in the petition, that said pavement shall not exceed a certain stipulated amount per square yard, said price, set forth in the petition, may be rejected by the council."

It is not pretended, in this case, either that the Standard Asphalt Rubber Company, of Chicago, has filed with the city the stipulation contemplated by the foregoing proviso, or that the petitioning property holders have set any limit upon the price of the pavement. Conceding that the Sarco road compound is not, technically speaking, patented, it is nevertheless a proprietary article, which, under that name, can be, and is, manufactured by no one else than the Standard Asphalt & Rubber Company. Moreover, the specifications provide that mineral rubber asphaltic cement (to be used for the purposes of the contract) "shall be Sarco road compound, manufactured by the Standard Asphalt Rubber Company, of Chicago, Ill.," so that, even if as good, or better, cement for the purpose, or a cement identical in all respects, could be furnished by some one else, it would not meet the demand of the specifications that the cement furnished shall be that manufactured by the Standard Asphalt Company, of Chicago; and, that being the case, it is evident that the Standard Asphalt Company, of Chicago, is about the only person, natural or judicial, who is in position to bid on the contract. It is true that the Standard Asphalt Company put in no bid; but it is also true that no one else did, save the Municipal Construction Company, now before the court, and we have no means of knowing how many bidders were deterred from competition by the apparent odds, which did not discourage the Municipal Construction Company. The president of the company last named seems to be satisfied that he can get the "Sarco compound" when he needs it and on satisfactory terms, and he gives it as his opinion that any other bidder might do the same thing; but we are unable to understand how, being, as he says, a stranger in interest to the Standard Asphalt Company, he can speak so confidently as to what that company will do, and the other possible bidders on the contract in question do not seem to have had the same assurance which the president of the defendant company gives to the court. They had, so far as they knew, the prospect of bidding against either the Standard Asphalt * * * Company itself, or against some concern representing that company or very friendly with it, and so they did not bid, and there was no competition. It appears, however, from testimony offered on behalf of defendants (which we omitted to notice in the statement which proceeds this opinion), that in the matter of the paving of Carrollton avenue (quite a recent affair) the contract was the largest of the kind ever offered by the city, and was adjudicated at the lowest price (save in one instance). It also appears that it was open to free competition, and that there were a number of competitors, and we cannot help thinking that, if the contract now under consideration had also been open to free competition, there would also have been a number of bidders. As the matter stands, we are of the opinion that the adjudication to the defendant company should be set aside. If the property owners still desire to have the "mineral rubber, etc., pavement," with the "Sarco road compound," they, and the city, can get it by complying with the proviso (to which we have referred) contained in Act No. 59 of 1908, and it is not easy to understand why they did not pursue that course originally.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment perpetually enjoining and restraining the defendants from proceeding with the execution of the contract entered into between them for the paving of City Park avenue from Bayou St. John to Canal street. It is further decreed that defendants pay all the costs of this suit.

PROVOSTY, J., concurs, but not in any intimation that may be understood to be contained in the opinion to the effect that a litigant who has a cause of action may be questioned as to his motives in exercising it, or, in other words, may be catechised for discovering whether, in vindicating his own good cause of action, he is acting for himself or for somebody else.