LANDRY, Judge.
Plaintiff, Roland S. Stevens, a resident taxpayer of East Baton Rouge Parish, individually and as President of Stevens Concrete Pipe and Products, Inc., instituted this action against The City of Baton Rouge, The Parish of East Baton Rouge (City-Parish) and Ray W. Burgess, Director, Department of Public Works for the City-Parish (Director), seeking a declaratory judgment and preliminary and permanent injunctions pronouncing the invalidity and barring the proposed enforcement and application of the City-Parish’s approval of the Director’s recommendation of specifications providing for minimum 12 foot lengths of concrete pipe to be used in all phases of a vast parish wide drainage project contemplated by the governing authority.
Plaintiffs contend the action complained of is stricken with nullity due to its being arbitrary, unreasonable and capricious. Plaintiffs further argue the proposed specifications are in violation of LSA-R.S. 38 :- 2211 et seq. (the “low bidder” or “public advertisement statute”) and LSA-R.S. 38:-2290 et seq. (the “closed specification law”).
The trial court found defendants acted arbitrarily, unreasonably and capriciously in recommending and approving such specifications for a public works project and issued the injunctions sought. From said unfavorable determination defendants have appealed. We are in accord with the result reached by our learned brother below, but for different reasons as will hereinafter appear.
Defendants excepted to plaintiffs’ petition on the ground it stated no right or cause of action. The Director maintains that as to him the trial court improperly overruled said exception because as an employee of the City-Parish, he merely recommended the specifications and no action on his part could effectuate them.. In this regard the Director maintains only the action of the City-Parish in formally approving his suggestions could render them operative, therefore, the action is essentially one against the governing authority. The City-Parish in essence contends its exception is valid because the matter of specifications for design of public improvements and the inclusion of certain materials therein is a legislative rather than judicial matter.
On the merits all defendants maintain the trial court erred in granting the injunction prayed for. In this connection it is urged that specification of material or design for public improvements is a legislative rather than judicial function concerning which governing authorities possess wide latitude and discretion and in which the courts may not interfere excepting where such action is clearly arbitrary, unreasonable and capricious. .It is further argued that one assailing the validity of such legislative action bears the burden of establishing its arbitrariness, unreasonableness and capriciousness. Additionally, defendants maintain the criteria of arbitrariness in such instances is that the party asserting same bears the burden of establishing an absence of a basis for a difference of opinion and the lack of substantial evidentiary foundation to justify the legislative action taken. Finally, defendants contend that where specifications for public improvements or projects violate no specific statutory provisions regarding competitive bidding, public policy does not prohibit the incorporation of minimum standards or requirements therein.
Literally, appellants argue the trial court erred in holding the action in question was arbitrary and capricious considering the evidence shows a substantial difference in professional opinion regarding the engineering criteria involved. Stated otherwise, defendants maintain that since the *501 record shows a substantial variance of expert opinion, regarding advisability of the requirement of minimum 12 foot pipe lengths for the proposed works, the trial court in effect has substituted its judgment for that of the governing authority contrary to settled jurisprudence. Appellants also urge that the trial court mistakenly held plaintiffs discharged the burden incumbent upon them of proving the alleged arbitrariness of defendants’ action. With regard to the aforementioned low bidder and closed specifications laws, appellants assert the former is inapposite because the governing authority is not directly purchasing the proposed materials but merely establishing a criteria pursuant to which materials will be purchased by the successful bidder on public works. The latter statute, according to appellants, is also impertinent because its resolution approving the controversial specifications relates to no particular job, contract, work or structure but merely announces its intention to make such a requirement effective as of a future date.
It is shown that defendant City-Parish has secured taxpayer approval of a $53,-000,000.00 bond issue, the proceeds of which are to be expended in a program of parish wide improvement and extension of drainage facilities to relieve the property owner and citizens of the City-Parish from the harsh and costly effect of repeated flooding occasioned by an admitted lack of adequate means for the prompt disposal of surface waters. Of the sum made available for this worthy public endeavor, it is estimated that $2,-000,000.00 will be expended in the purchase of concrete pipe or conduits of varying dimensions. The objective is to be accomplished by the letting of numerous contracts, each especially engineered and designed as a correlated component of the whole and still fulfill its own immediate or particular purpose.
As Director of the City-Parish Department of Public Works, Burgess was assigned the duty of designing the master plan for the project and all aspects thereof. In the course of such planning and preparation he conferred with his engineering staff, members of the City-Parish government and private individuals and contractors normally interested in such matters. Certain preliminary phases of the project were assigned to a committee of the City-Parish government organization known as the Capital Improvements Expediting Committee (Committee). On February 1, 1966, the Director submitted to the Committee assembled in open, regularly scheduled meeting, recommendations for new pipe criteria for the project. In effect the Director advised the Committee that predicated upon certain scientific and professional data in his possession, the “n” factor involved in equating the volumetric capacity of concrete pipe (the significance of which will hereinafter appear) could be reduced approximately 10% by requiring concrete pipe in minimum lengths of 12 feet instead of 8 feet as in present specifications. On this basis the Committee was advised that a reduction in proposed pipe diameters could be made if 12 foot lengths were utilized for the project resulting in a saving of an estimated $400,000.00 to the governing authority. On the strength of this recommendation, the Committee adopted a resolution of intent to go to 12 foot pipe lengths effective September 1, 1966. Thereafter, on February 9, 1966, the Committee held an unscheduled meeting whereat a motion was successfully carried, the pertinent portion of which read as follows:
“ * * * that the Council adopt the new pipe criteria as proposed by the Director of Public Works effective September 1, 1966, and that all projects to be left prior to September 1, be designed under present criteria, and all projects to be let after September 1, be designed under the proposed criteria with an “n” factor of 0.010 and requiring a minimum of 12 foot lengths.”
On February 16, 1966, the City-Parish Council met in regular session and adopted the recommendation approved by the Com *502 mittee on February 9, 1966. The injunction sought by plaintiffs seeks to enjoin enforcement of the February 16, resolution.
At the trial below, counsel for appellants attempted to introduce in evidence letters from 22 local consulting engineers and 17 area contractors which in general approved, endorsed and recommended the use of 12 foot pipe in the proposed project. Counsel for plaintiffs objected to the introduction of these documents on the grounds they constituted hearsay inasmuch as their authors were not available for cross-examination. Appellants’ attorney maintained the letters were admissible for the limited purpose of refuting the charge of arbitrariness lodged against defendants. Counsel argued that the letters indicate the City-Parish had considerable information and evidence before it at the time it adopted the pipe criteria on February 16, 1966, which showing was germane to the issue of whether the action of the governing authority was arbitrary, unreasonable or capricious. The documents, appearing in the record as an offer of proof should, we believe, have been admitted by the trial court for the restricted purpose contended by counsel. They do, as suggested, bear upon the question of the alleged arbitrariness of the City-Parish action. Their exclusion, however, is a matter of no moment; the error is inconsequential and results in no prejudice to defendants’ cause inasmuch as we •find this case does not turn on the point of •defendants’ purported arbitrariness,
At the outset we wish to point out that whereas plaintiffs’ petition contains charges and allegations of partiality, favoritism and an attempt on the part of the City-Paris and Director to favor a certain pipe fabricator on the ground that at the time of adoption of the February 16, resolution only that one manufacturer possessed equipment capable of producing pipe in 12 foot lengths, nothing in the voluminous record before us (containing some 2,000 pages) supports such a conclusion with that degree of certainty required by law. It suffices, we think, to point out that whereas it appears the Director was friendly with the individual concerned and had at one time been in his employ, the events hereinafter narrated seem to refute plaintiff’s claims the change in' pipe criteria was designed to favor this individual by giving him a monopoly. Firstly, the resolution itself adopted February 16, 1966, by its own terms does not become operative until September 1, 1966, a period of six and one-half months thereafter. Secondly, it appears that plaintiff corporation itself possessed machinery identical to that of the person allegedly favored, although Stevens admittedly would have had to purchase certain additional adapting devices, casts, and other apparata to manufacture pipe of all dimensions in 12 foot lengths. • Plaintiff estimated that the cost of converting its facilities to become competitive would approximate $150,000.00. Thirdly, it appears that a manufacturer in a nearby community possessed equipment capable of manufacturing concrete pipe in 16 foot lengths. He too would, however, have to purchase considerable appurtenances to become competitive in the manufacture of all diameter pipe in 12 foot lengths.
As regards the members of the City-Parish governing authority who voted for the controversial resolution, the record is totally devoid of evidence indicative of any improper motive on their part or that the action was predicated upon an intent to favor or show partiality to any individual, firm or corporation. The record reflects that in adopting the resolution in dispute, the council members acted solely upon the Director’s recommendation, relying upon his professional judgment and advice and with the view that the governing authority would thereby effect a saving of funds.
The significance of the “n” factor in this litigation is that it forms a component of Manning’s Formula by which engineers scientifically compute the volume of liquid flow through a conduit or pipe. In employing Manning’s Formula, the friction (resistance) encountered within the conduit *503 by the liquid passing through is designated by the letter “n”. The “n” value in the formula, therefore, represents merely the friction factor which is but one of numerous equations involved. It is conceded by all experts who testified herein that the “n” factor is incapable of mathematical computation but rather is determinable only by tests conducted in hydraulic laboratories with the aid of elaborate equipment operated at considerable expense. The “n” values of different type conduits are reported in numerous scientific journals which are consulted by engineers designing a drainage system. The prime element of the “n” factor is smoothness of pipe barrel or bore. The smoother the interior of the pipe the less “n” factor, hence less resistance to any liquid passing through. Succinctly, defendants maintain that 12 foot lengths of pipe were specified because scientific data shows that as between 8 foot lengths of pipe (the specification previously in effect) and 12 foot lengths there is a 10% favorable or lower differential. On this basis, it is argued that the use of minimum 12 foot lengths will achieve the desired “n” factor of 0.010 with smaller dimension pipe thus affecting a saving to the City-Parish in the cost of the proposed project. Additionally, defendants maintain longer length pipe will reduce the number of joints thus lowering both initial construction and maintenance cost.
Plaintiffs, however, assert there is no scientific or professional data supporting a reduced “n” factor of 10% as between 8 and 12 foot lengths of pipe. Plaintiffs also argue that all experiments conducted and all scientific journals and papers published on the subject support the conclusion there is no significant difference in the “n” factor as between 8 and 12 foot lengths of pipe. Further, plaintiffs contend there is no proof a more efficient system would result from the use of 12 foot lengths of pipe by virtue of a reduction in joints. In this regard, plaintiffs maintain that the specifications call for joints to be sealed by means of a confined “O” ring which produces a trouble free joint, and when used with' 8 foot lengths of pipe will produce a system as efficient as one constructed with 12 foot pipe.
Defendant Burgess’ exception of no right and no cause of action is based on the premise he is merely a governmental employee making professional recommendations to his employer for such action as his employer may see fit. He maintains he has no power or authority to effectuate the recommendations and is therefore neither a proper nor an indispensable party to this action. We think the contention lacks substance. For reasons which will hereinafter appear, LSA-R.S. 38:2290 et seq., the “closed specification statute” is found to be applicable to the instant case. The pertinent law clearly provides in Section 2290 that “No architect or engineer, either directly or indirectly, shall submit a closed specification of a product to be used in the construction of a public building or project * * The injunction sought against Burgess individually is requested in his capacity as Director and seeks to prevent his recommending an allegedly closed specification to the City-Parish for an admittedly public work. If the specification does in fact contravene the applicable law, Burgess, individually, may be enjoined from continuing its recommendation to his employer because such action is clearly proscribed by the statute.
The exception of no right and no cause of action tendered on behalf of City-Parish is founded on essentially the same principles urged in defense of the merits, namely, the question of specifications for public works is a legislative matter of no concern to the courts. We find the argument without foundation as we shall proceed to demonstrate.
In support of the contention that specifications for the design of public improvements and the inclusion of particular materials in such an improvement is a legislative rather than judicial matter, appellants cite Section 20, Act 169 of 1898; *504 L.R.S. 38:141-144, L.R.S. 33:1236, Wharton v. City of Alexandria, 226 La. 675, 77 So.2d 1; Gibson v. City of Baton Rouge, 161 La. 637, 109 So. 339, 47 A.L.R. 1151; Eckerle v. Ferris, 175 Okl. 107, 51 P.2d 766.
As a basis for the argument that municipal authorities possess wide latitude in the selection of materials for use in public improvement projects, the City-Parish relies on McQuillin, Municipal Corporations, 3rd Ed., Vol. 10, § 29.44; McQuillin, Municipal Corporations, 3rd Ed., Vol. 13, § 37.-29; Wharton v. City of Alexandria, supra.
The premise that one assailing the validity of legislative action bears the burden of establishing the alleged invalidity is founded on City of New Orleans v. Beck, 139 La. 595, 71 So. 883, L.R.A.1918A, 120; Ward v. Leche, 189 La. 113, 179 So. 52; State v. Saia, 212 La. 868, 33 So.2d 665; Meyers v. City of Baton Rouge et al., La.App., 185 So.2d 278.
Appellants’ authorities for the rule that courts may not interfere with the exercise of legislative discretion nor substitute its judgment for that of the legislative body except where legislative action is clearly arbitrary and unreasonable are 62 C.J.S. Municipal Corporations § 199; 62 C.J.S. Municipal Corporations § 148; LaFleur v. City of Baton Rouge, La.App., 124 So.2d 374; Blocker v. City of New Orleans, La.App., 50 So.2d 498; Archer v. City of Shreveport, La.App., 85 So.2d 337; Scott v. City of West Monroe, La.App., 95 So.2d 343; Boyle v. New Orleans Public Service, La.App., 163 So.2d 145.
Webb v. Dameron, Tex.Civ.App., 219 S. W.2d 581; In Re St. Paul and Tacoma Lbr. Co., 7 Wash.2d 580, 110 P.2d 877, and Torrance v. Caddo Parish Police Jury, La.App., 119 So.2d 617, are relied upon by appellants as establishing that in order for legislative action to be arbitrary, capricious and unreasonable, it must appear there was no room for a difference of opinion regarding the issue and that there was no substantial evidence justifying the action taken.
Appellants’ final premise, namely, that where specifications for public works do not violate specific statutory provisions regarding competitive bidding, but rather conform to such statutes, there is no public policy prohibiting designation of minimum standards by a legislative body, is supported by the citation of McQuillin, Vol. 10, § 29.42; L.R.S. 38:2211; L.R.S. 38:2290-2296; 77 A.L.R. 702; McCutchen v. City of Shreveport, 160 La. 986, 107 So. 775; Eckerle v. Ferris, supra.
The authorities cited by appellant do indeed establish the principles and rules contended for by appellants. They are, however, inapposite to the case at hand. Each authority in effect involves a field or area of local government deemed legislative in nature and concerning which the courts will not interfere except under circumstances which clearly demonstrate arbitrary, unreasonable or capricious action on the part of the legislative body. For example, Gibson v. City of Baton Rouge, supra, involved selection of a site for a garbage dump. Salaries of municipal employees was the issue in LaFleur v. City of Baton Rouge, supra. An exchange of property between governmental agencies was the question to be resolved in Blocker v. City of New Orleans, supra. Archer v. City of Shreveport, supra, decided a question of zoning. Parking restrictions was the issue in Scott v. City of West Monroe, supra. In Boyle v. New Orleans Public Service, supra, the court was called upon to decide the propriety of a change from streetcars to buses on a certain transit line. Wharton v. City of Alexandria, supra, presented two questions, namely: (1) the adequacy of a paving petition, and (2) whether subsurface drainage as distinguished from open ditches was authorized under the applicable statute permitting paving upon petition of property owners.
It has long been the settled jurisprudence of this state that contract specifications for public works which tend to stifle competitive bidding run afoul of and con *505 travene the low bidder statutes. In Redersheimer v. Flower, 52 La.Ann. 2089, 28 So. 299 (1900), the Supreme Court considered the validity of specifications for asphalt to be used in public paving proj ects in the City of New Orleans. In substance the specifications required the use of imported rock asphalt and stipulated that as regarded foreign rock asphalt that provided from certain named mines should equal in quality rock asphalt from certain other specifically named mines. The “or equal” clause was intended to permit use of the products from any concern which were equal to those of the named concerns. Notwithstanding the court therein recognized that the rock asphalt specified was a superior product, the court struck the requirement down as invalid stating:
“At the outset of the discussion, we are confronted with the statutory provisions requiring that the contract be awarded to the lowest bidder. To the council is given the right to advertise for bids to construct pavements. The Sicilian rock asphalt was, in view of the guaranty offered, considered the lowest bid for work advertised by the council. The testimony shows that the material in question is of a superior quality. The difficulty grows out of the fact that it is obtained from one of the few mines mentioned in the specifications (that is, by special mention in the specifications), and in that way, plaintiff urges, competition was stifled. It is true that rock asphalt is obtained in large quantities in many places. It is also true that it varies in its composition, and that much of it is of inferior quality. For this reason defendants contend, in support of the specifications which plaintiff asserts are offending and injurious, that a standard must be adopted in order to protect the city against worthless materials. We are not inclined to deny the truth of the proposition. In view, however, of the provisions of the charter requiring competition in matter of bids, we are disposed to think that the specifications in question should be expanded a little and liberalized somewhat. While the lowest bidder should not be afforded the opportunity of using untried and worthless materials, on the other hand the standard or grade of materials required should be broad enough to embrace, if not absolutely all, at least a goodly portion, of the first-class material offered for sale. Rock asphalt is not res incognita. It has been known from time immemorial, and surely a standard of quality can be adopted without limiting bids to three or four mines. We are informed by the evidence that the foreign product of the rock-asphalt mines referred to was selected chiefly for the reason that domestic rock asphalt has not given satisfaction as a pavement. None the less, we do not find in the record sufficient reason for excluding all mines save those mentioned in the specifications. There are many other mines than those before mentioned which produce a pure and durable quality of rock asphalt. Even domestic rock asphalt, although it has not yet found its way freely into the markets, is entitled to a hearing.”
In Saxon v. City of New Orleans, 124 La. 717, 50 So. 663, specifications calling for mineral rubber asphaltic cement of a given brand name manufactured by a specific corporation was declared invalid as violative of the low bidder act in that it stifled competition by eliminating products as good or better than that specified.
McCutcheon v. City of Shreveport, 157 La. 699, 102 So. 875, 160 La. 986, 107 So. 775, was a suit by a taxpayer to enjoin a contract which specified a particular process for paving. Quoting from and applying the rule of the Saxon case, the court in Mc-Cutcheon held the specifications void inasmuch as they ruled out other products just as good or better than those stipulated.
The rationale of these cases was reaffirmed and stated in Parish Council of Parish of East Baton Rouge v. Louisiana Highway and Heavy Branch of Associated *506 General Contractors, Inc., La.App., 131 So. 2d 272, which incorporated into public sewer contracts .a minimum wage schedule.
In Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627, the court, in dealing with a contract granted in violation of the state’s low bidder statute requiring public advertisement and competitive bids, stated:
“This statute in so far as it requires advertising and the obtaining of competi-~ tive bids is a prohibitory law founded on public policy. It was enacted in the interest of the taxpaying citizens and has for its purpose the protecting of them against contracts of public officials entered into because of favoritism and involving exorbitant and extortionate prices. It was not passed for the benefit of the officials and the entities which they represent.
A contract made in violation of that statutory requirement is wholly illegal. According to the great weight of authority, it is unenforceable even though the work has been performed or materials furnished; neither can recovery be had on a quantum meruit basis. * * * ”
To the same effect see Bartley, Incorporated v. Town of Westlake, 237 La. 413, 111 So.2d 328.
Also apropos the issue at hand is the prohibition against closed specifications with regard to public contracts provided in the 1965 addition to Title 38 of our Revised Statutes of Sections 2290-2296, inclusive, the pertinent sections of which provide:
“§ 2290.
A. No architect or engineer, either directly or indirectly, shall submit a closed specification of a product to be used in the construction of a public building or project, unless all other products, other than the one specified, would detract from either the utility or appearance of the building or the uniform appearance of other public buildings in the immediate vicinity.
* * * V
“§ 2292.
The approving authority may accept a closed specification only after it determines that all products brought to its attention are excludable under the provisions of R.S. 38:2290, however, the approving authority must reject the closed specification, should another product of equal utility and appearance be submitted to them prior to letting of the bid, in which event the specifications must be amended so as to allow substitution of an equal.”
It seems clear that the 1965 statute is in pari materia with LSA-R.S. 38:2211 et seq. Its obvious purpose is to supplement the low bidder statute by providing that not only shall all contracts for public improvements exceeding the statutorily set amount be let pursuant to advertisement for competitive bids, but that in addition, uninhibited competitive bidding be assured by prohibiting the use of closed specifications which exclude products of equal utility and appearance. The provisions of LSA-R.S. 38:2290-2296, inclusive, are but obvious statutory confirmation of the rule established in the jurisprudence herein-above discussed in detail.
The true issue before the court, therefore, is simply whether the specifications in question violate the terms of the two statutes involved by stifling competition through the process of eliminating products just as good as those expressly stipulated.
Before disposing of the aforesaid issue, we will first consider defendants’ contention LSA-R.S. 38:2211 is inapplicable because the City-Parish itself is not directly purchasing pipe but rather all such purchases shall be made by the successful bidder who will be a private person, firm or corporation.
That such specifications are proscribed notwithstanding the materials called *507 for will be purchased in pursuance of contracts let by public agencies rather than by the governmental authority itself is well established law. In the Redersheimer case, supra, the rock asphalt specified was to be purchased by the contractor, not directly by the City of New Orleans. The same was true in the Saxon case, supra, wherein the controversial material was to be purchased by the contractor, not the governing authority, pursuant to contract specifications.
We are also of the opinion the specification of minimum 12 foot length pipe violates both the letter and spirit of the closed specification law, LSA-R.S. 28:2290-2296, inclusive, because, as will be subsequently shown, the requirement eliminates the use of products of equal utility.
There is no merit in the argument the closed specification law is not applicable because the specifications in question do not relate to a particular project but rather to a number of projects contemplated to be let at a future date. The record is clear that a comprehensive project is proposed as a whole although it will be let in individual contracts each designed to fulfill its integral part of the master plan. The proposed action of the City-Parish, therefore, would, if allowed to stand, result in a series of violations of the statute, an infraction with the letting of each individual contract. The announced intention of defendant to let such contracts in the future is manifest by its resolution of February 16, 1966. It is not disputed that unless prohibited from so doing, defendant City-Parish will proceed to let each contract pursuant to the approved specifications. Plaintiff is consequently entitled to the injunction prayed for to prevent the violation before its occurrence.
Counsel for appellants attempts to distinguish the case at hand from Redersheimer, supra, on the ground the cited authority involved a special assessment levied against property owners subject to petition for a particular street paving project. As we understand the argument, it suggests that in such instances a stricter compliance with public bidder laws is demanded in order that the property owners get the particular improvement desired. We understand the disputation further avers the rule applicable in so-called special assessment cases does not apply to public works undertaken pursuant to the general authority of the governmental agency to construct public works, as in the case at hand. In cases falling within the latter category, according to counsel, a wider latitude is granted the governing authority with respect to the choice of materials and processes. Additionally, the argument continues, it is settled that patented articles and processes may properly be specified in works constructed pursuant to general authority and many authorities are cited in support of this facet of the premise. Therefore, according to counsel, if patented articles can be specified in a contract of this nature, it follows that the requirement in question is not offensive in that no contractor is restricted in the purchase of pipe to a patented brand and the record shows that any manufacturer so desiring may obtain the machinery and equipment necessary to manufacture all dimensions of concrete pipe in 12 foot lengths.
Our view of the authorities cited by counsel discloses that in other jurisdictions the majority appears to make'some distinction between special assessment cases and instances arising under the general power of the governing authority to construct improvements. It appears a somewhat more liberal rule of compliance with public bidder laws is applied with respect to constructions within the latter classification.
Counsel next quotes at length from Eckerle v. Ferris, 175 Okl. 107, 51 P.2d 766, in which the Oklahoma Supreme Court considered specifications calling for the use of “blended rock asphalt” as the finishing surface on a highway construction contract. The material was attainable at only one location within the state thus generating the charge of monopoly. The court reviewed the pertinent jurisprudence at *508 length, including our Redersheimer case, supra, which it criticized rather severely as seemingly constituting a departure from the general rule.
Notwithstanding the Eckerle case, supra, we find the continuing tenor of our own jurisprudence in effect recognizes no difference between a public contract let pursuant to an assessment levy as distinguished from one undertaken pursuant to the general governmental power to construct public improvements. The decisions of our own Supreme Court are, of course, decisive.
We note particularly that in Saxon v. New Orleans, supra, which involved a paving contract (presumably pursuant to a paving assessment), suit was brought by a citizen who owned no property on the street to be improved. The contention that such a plaintiff was without interest to question the legality of the proposed contract was rejected by the Court.
Additionally, the applicable statutes make no distinction between special assessment contracts and those constructed pursuant to general authority. The express language of the pertinent laws applies generally to all public contracts regardless of nature or method of financing.
Assuming, as defendants contend, a more liberal rule of construction obtains herein because the proposed project is not one involving a special assessment levy, nevertheless, we find the specification in question exceeds the latitude possessed by the City-Parish inasmuch as the requirements are deemed to produce a stifling of competition as will hereinafter be shown.
We come now to what we determine to be the fundamental issue in this litigation, namely, whether the specifications involved do as a matter of fact violate LSA-R.S. 38:2211 et seq. because they stifle competitive bidding on a public improvement contract and also contravene LSA-R.S. 38 :- 2290-2296, inclusive, by eliminating materials equal to or as good as those specified?
The Director, a Civil Engineer with many years experience, including directorship of the State Highway Department, was called under cross-examination extending over several days. The gist of his testimony is that based on certain “Baltimore tests,” which showed a 10% differential in “n” factor as between four and eight foot pipe, he assumed a similar relationship between 8 and 12 foot pipe. Burgess was aware of tests conducted by the St. Anthony Falls Hydraulic Laboratory and more particularly its Technical Paper No. 22, Series B, dated December, 1960, which showed an insignificant difference in “n” factor as between 8 and 12 foot pipe. Burgess, however, discounted the accuracy of this finding on the ground that the tests were conducted only with 8 foot pipe and the result thus obtained used to determine the “n” factor of 12 foot pipe by interpolation or mathematical calculation. He contends in essence the tests were made under ideal laboratory conditions and did not take into account numerous field problems. He conceded that excepting for the Baltimore report (which did not involve tests with 12 foot pipe), no scientific journal, paper or report substantiated his view of a 10% differential in “n” factor as between 8 and 12 foot pipe. Nevertheless, based on the Baltimore report and his own experience and judgment, he maintained there was in fact such a difference. His position in respect to improvement of a system by elimination of joints (which reduction of course would result from the use of 12 foot pipe) is that any factor lessening the smoothness of pipe barrel causes turbulence in the system in the form of miniature eddies, thus increasing resistance with a consequent decrease in flow. According to Burgess, practical problems in the field demonstrate the difficulty in obtaining smooth joints, therefore, every joint is a potential source of turbulence decreasing the efficiency of the system. He reasons, therefore, that elimination of joints increases efficiency and at the same time reduces maintenance cost as experience shows that in both construction and main *509 tenance, joints are the greatest source of trouble. Burgess acknowledged the St. Anthony Falls tests show an insignificant difference in “n” factor resulting from experiments conducted with pipe having “good”, “fair” and “poor” joints (to simulate faulty field installation), and that similarly only slight difference in “n” factor was shown by tests made with pipe into which artificial barriers were inserted to create turbulence. Nevertheless, it is Burgess’ opinion that even good joints significantly affect the “n” value.
As regards joints made with what is known in the profession as a “confined O ring” (which type of joint is called for in the specifications and is admitted by all experts, including Burgess, to be far superior to previously used mortar joints), Burgess is of the view that even such joints are a source of turbulence which appreciably affect the “n” factor. In addition, Burgess felt that the use of 12 foot lengths of pipe would decrease construction costs because of the number of joints which would have to be made and because, with the laying of each joint an additional four feet of line would be installed.
Edward E. Evans, Civil Engineer possessing a master’s degree, in substance agreed with Burgess. He placed little credence in the St. Anthony Falls tests because they were not conducted with 12 foot pipe. He was of the definite opinion joints have an appreciable effect on “n” factor and that elimination of joints would produce a better system. Predicated on his professional judgment and experience, he believed a 10% difference should be accorded 12 foot pipe over 8 foot pipe. Evans was also of the opinion the use of longer pipe would produce a more efficient system at reduced cost and would materially lower maintenance expense.
Testifying on behalf of defendants, Horatio Nash Ogden, Consulting Civil Engineer, L. A. Germaine, Civil Engineer, and Sidney L. Zeid, Civil Engineer, all corroborated Burgess and Evans to the effect that the specifications as written would produce an efficient system requiring a minimum of maintenance because of the reduction in number of joints. They also confirmed that in recent years the trend has been toward longer pipe.
Dr. Paul G. Mayer, possessing a Ph.D. degree in Civil Engineering, Associate Professor of Civil Engineering, Georgia Institute of Technology, testified at length concerning the St. Anthony Falls tests which he explained in effect constitute the “Bible” as respects experiments concerning “n” factor. In his opinion the tests show no significant difference in “n” factor due to a decrease in joint numbers resulting from the use of longer pipe. He was not cognizant of any scientific data which supported as much as a 3 or 4% difference in “n” factor as between 8 and 12 foot pipe. Although he conceded no literature on the subject expressly states that joint numbers do not affect “n” factor, it is his opinion that all authoritative publications imply “n” factor is unaffected by the number of joints in a system. He was likewise of the opinion that use of 8 foot pipe joined by means of a confined O ring would produce a system as efficient and trouble free as one constructed with 12 foot pipe. According to Dr. Mayer, the use of 12 foot pipe would not significantly reduce the “n” factor consequently pipe of the same dimension would be required whether 8 or 12 foot lengths be utilized. With regard to increased maintenance cost reputedly flowing from the increased number of joints, Dr. Mayer was of the opinion there would be no such increase because such joints were virtually trouble free. He acknowledged, however, that the greater number of joints present some additional potential difficulty but not sufficient, in his view, to justify exclusion of 8 foot pipe. He denied construction costs could be reduced by requiring minimum 12 foot pipe.
Joseph P. Krupp, C. E., Associate Professor, Louisiana State University, testified in substance that tests show no significant difference in “n” factor in pipe joined with *510 good joints. He further testified that none of the writings on “n” factor indicate that the number of joints in a system should be considered in determining this element of Manning’s Formula. He was of the opinion a system constructed of 8 foot pipe united by use of a confined O ring would produce a system as efficient as one built of 12 foot pipe.
Cecil K. Oakes, C. E., Chief Hydraulic Section, Louisiana Department of Highways, deposed there is no difference in efficiency as between 8 and 12 foot pipe. He also stated it is inadvisable to use pipe of smaller dimension inasmuch as a system commences deteriorating immediately upon construction. He explained that everything that happens to a system upon completion decreases its efficiency. It accumulates mud, dirt and debris. The walls of the pipe become abraded by materials carried by the water flowing through and the cumulation of these and other factors reduce the carrying capacity of the pipe.
Several contractors and pipe manufacturers were called on behalf of plaintiffs and testified in substance it would be more difficult and expensive to lay pipe in 12 foot joints as opposed to 8 feet. They pointed out that in municipalities one frequently has to work in close quarters where longer lengths of pipe involve space problems and might constitute a detriment because of utility poles, overhead wires, buildings adjacent to streets and narrow streets. They also observed that subterranean facilities such as gas and water lines, among others, could present serious problems in the laying of long lengths of pipe in modern municipalities of considerable size. They all considered the cost of equipping themselves to lay 12 foot pipe would be prohibitive and eliminate them from competition.
We believe our review of the voluminous testimony adduced herein, admittedly in capsule size, presents a fair analysis of the evidence offered in the trial court. We are of the further opinion defendants have failed to establish by that degree of proof required by law to prevail, that the use of 12 foot pipe in the proposed project would produce a better or more efficient system. On the contrary, we find the clear weight of the evidence to be in favor of plaintiff’s contention that the use of 8 foot pipe, joined by confined O rings as the specifications provide, would result in a system just as good as one constructed of 12 foot pipe as now proposed.
As to the element of cost, we do not find the record preponderates one way or the other. Should, however, it be shown the use of 12 foot pipe would enable a slightly lower construction cost, this fact, standing alone, would not justify specifications which preclude the use of a product equal in utility. The clear intent of the applicable statutes is to provide for both competitive bidding, the objective of which is to reduce cost and at the same time eliminate fraud, favoritism and extravagance, and insure competition by guaranteeing that persons furnishing materials and supplies, of equal utility to those specified, are afforded an opportunity to bid the merits of their products which will do a job as good as those called for in the specifications. Unless all elements are satisfied the proposed action of the governing authority contravenes express law and is consequently stricken with nullity.
We find in the record some evidence establishing the modern trend to progressively longer pipe lengths in projects of this nature. The record, however, does not establish that the use of longer lengths will provide an appreciably more efficient system at reduced construction cost or that maintenance expense would thereby be reduced significantly. Insofar as concerns the record before us, the difference in efficiency, if any, resulting from the use of 12 foot pipe is minimal to say the least. Until defendants’ premise is established with that degree of certainty required by law, we can only conclude that the requirement stifles competition by precluding the use of products equivalent to those specified.
*511 Counsel for appellants argues plaintiff’s inconsistency in opposing the 12 foot requirement on the ground of closed specifications while at the same time agreeing that the mandate for confined O ring joints does not offend the statute for similar reason.
The answer to this contention lies in the fact that all of the witnesses, including defendants’ experts, readily concede the O ring joint is vastly superior to the customary mortar joint. The closed specification law clearly recognizes the right to impose such a regulation where there is no other product or process of equal utility. It further appears that the right to use the confined O ring method of joining concrete pipe is not the exclusive possession of any person, firm or corporation hut rather that all of the major contractors in the Baton Rouge area can utilize the process and recommend its employment for the project. Under such circumstances, the requirement for the O ring joint does not violate the terms of LSA-R.S. 38:2290-2296, inclusive.
For the reasons hereinabove assigned, the judgment of the trial court is affirmed. Defendant City-Parish to pay all costs for which they are amenable by law.
Affirmed.